AARON B. COOLEY, PLAINTIFF IN ERROR, *v.* THE BOARD OF WARDENS OF THE PORT OF PHILADELPHIA, TO THE USE OF THE SOCIETY FOR THE RELIEF OF DISTRESSED PILOTS, THEIR WIDOWS AND CHILDREN, DEFENDANTS.
SAME *v.* SAME.

A law of the State of Pennsylvania, that a vessel which neglects or refuses to take a pilot shall forfeit and pay to the master warden of the pilots, for the use of the Society for the relief of Distressed and Decayed Pilots, their widows and children, one half the regular amount of pilotage, is an appropriate part of a general system of regulations on the subject of pilotage, and cannot be considered as a covert attempt to legislate upon another subject, under the appearance of legislating on this one.

Nor can the exemption of American vessels engaged in the Pennsylvania coal-trade from the necessity of paying half pilotage, be declared to be other than a fair exercise of legislative discretion, acting upon the subject of the regulation of the pilotage of the port of Philadelphia.

The law of Pennsylvania is, therefore, not inconsistent with the second and third clauses of the tenth section of the first article of the Constitution of the United States. Imposts, and duties on imports, exports, and tonnage, were understood, when the Constitution was formed, to mean totally distinct things from fees of pilotage.

Nor is the law repugnant to the first clause of the eighth section of the first article of the Constitution, because, as the charge is not a duty, import, or excise, there is no necessity for its being uniform throughout the United States.

Neither is the law repugnant to the fifth clause of the ninth section of the first article of the Constitution; because it neither gives a preference of one port over another, nor does it require a vessel to pay duties.

Upon this point, the act of Congress, passed in 1789, (1 Stat. at Large, 54,) recognizing the pilot-laws of the States, is entitled to great weight, as showing that these laws neither levied duties nor gave a preference of one port over another.

Moreover, the law is not inconsistent with the third clause of the eighth section of the first article of the Constitution.

It is true that the power to regulate commerce includes the regulation of navigation, and that pilot-laws are regulations of navigation, and, therefore, of commerce, within the grant to Congress of the commercial power.

But the mere grant of the commercial power to Congress, does not forbid the States from passing laws to regulate pilotage. The power to regulate commerce includes various subjects; upon some of which there should be a uniform rule, and upon

Cooley *v.* Board of Wardens of Port of Philadelphia et al..

others different rules in different localities.    The power is exclusive in Congress in the former, but not so in the latter class.

Although Congress may legislate upon the subject of pilotage throughout the United States, yet they have manifested an intention not to overrule the State laws, except in one instance.    The law of Pennsylvania, not being overruled, is not repugnant to the Constitution of the United States.

THESE two cases were brought up from the Supreme Court of Pennsylvania, by writs of error, issued under the twenty-fifth section of the Judiciary Act.

They both depended upon the same principle, were argued and decided together, and will be treated as one.    The only difference between them was, that the pilotage was demanded from two different vessels, the Undine and the Consul. . Cooley was the consignee of both vessels.

The twenty-ninth section of the act passed by the Legislature of Pennsylvania on the 2d of March, 1803, is set forth at length in the opinion of the court and need not be repeated.

The board of wardens brought an action of debt before Alderman Smith, against Cooley for half-pilotage, due by a vessel which sailed from Philadelphia without a pilot, when one might have been had.    The magistrate gave judgment for the plaintiffs, and the defendant appealed to the Court of Common Pleas.

In that court, a declaration in debt was filed by the plaintiff below.    In the case of the Undine, the defendant demurred, and upon the demurrer, judgment was given for the plaintiff.

In the case of the Consul, the defendant put in two pleas.

1. That the Consul was engaged in the coasting trade, sailing under a coasting license from the United States.

2. That the said schooner was bound from the port of Philadelphia, in the State of Pennsylvania, to the port of New York, in the State of New York.

To both of which pleas there was a demurrer and a joinder in demurrer, and a judgment for the plaintiff.

The case was then carried to the Supreme Court of Pennsylvania, which, in January, 1850, passed the following judgment:

That "the judgment of the Court of Common Pleas for the city and county of Philadelphia be affirmed, because this court is of opinion that the twenty ninth section of the act of the State of Pennsylvania, of the 29th of March, A. D. 1803, entitled An act to establish a Board of Wardens for the port of Philadelphia, and for the regulation of pilots and pilotages, and for other purposes therein mentioned, is not in any of its provisions involved in this cause, at variance with any of the provisions of the Constitution or laws of the United States, but is a constitutional and legal enactment."

Cooley then brought the case up to this court.

It was argued by *Mr. Morris* and *Mr. Tyson*, for the plaintiff in error, and by *Mr. Campbell* and *Mr. Dallas*, for the defendants.

For the plaintiff in error, it was contended that the law of Pennsylvania was unconstitutional and void, because:

1. It is repugnant to the first and third clauses, eighth section, first article of the Constitution of the United States.

The first clause declares that all duties, imposts and excises, shall be uniform throughout the United States; and the third, that Congress shall have power to regulate commerce with foreign nations, and among the several States.

Upon the first clause we argue, that the constitutional uniformity enjoined in respect to duties and imposts, is as real and obligatory on the States in the absence of all legislation by Congress, as if the uniformity had been made by the legislation of Congress. The twenty-ninth section of the act of Pennsylvania, of 29th March, 1803, in question, and the second section of the act of June 11th, 1832, overthrow every thing like uniformity.

No penalties, then, imposed by either of these acts can be binding.

Upon the third clause we argue, that the power to regulate commerce is exclusive in Congress.

2. It is repugnant to the second clause of the tenth section first article of the Constitution of the United States, to wit:—

" No State shall, without the consent of Congress, lay any imposts, or duties, on imports or exports, except what may be absolutely necessary for executing its inspection laws, and the net produce of all duties and imposts laid by any State on imports and exports shall be for the use of the treasury of the United States." And to the subsequent branch of the same clause, which declares, " No State shall, without the consent of Congress, lay any duty on tonnage."

The present case resembles Brown v. the State of Maryland. 12 Wheat. 419. There the tax was exacted for the privilege of selling. Here for the privilege of introducing or sending away.

The defendant in this case is the consignee, the merchant. This is, in reality, a tax upon imports. Judge Grier, Norris v. The City of Boston, 7 How. 458, 459. It is a tax upon those engaged in the business of importation, arising out of their position as importers.

It is a tax for a particular purpose, the support of a hospital for decayed pilots. If the State can appropriate the funds to this purpose, she can appropriate them to any other,—a general hospital for mariners, or an alms-house for indigent foreigners.

If the right be once admitted, and she choose, she can make

the tax so high as to exclude commerce altogether. She can exclude all vessels not engaged in particular trades.

If this is a tax or duty, which we think is clearly shown, it is a tax or duty on tonnage, and, therefore, contrary to the second clause, first section, first article of the Constitution of the United States: " No State shall, without the consent of Congress, lay any duty on tonnage."

This is a duty on a tonnage of seventy-five tons or more, and increases with the increased draught of water. The same power might increase the duty or tax, varying it with the increased tonnage.

It may be said that Congress has consented, by the act of 7th August, 1789, section 4, —

" That all pilots in the bays, inlets, rivers, harbors, and ports of the United States, shall continue to be regulated in conformity with the existing laws of the State, respectively, wherein such pilots may be, or with such laws as the States may respectively hereafter enact for the purpose, until further legislative provision shall be made by Congress." The act of Congress 2d March, 1837, 5 Stat. at Large 153, is a repeal of the part of the act of 1803 now in question.

But this act of Pennsylvania which we object to, is not an act to regulate pilots. It is an act to raise a fund for the support of decayed pilots.

We answer further: Congress may adopt State legislation when within constitutional limits, no doubt; yet it cannot be, that by general legislation of this kind, they can prospectively confer upon the States powers not given by the Constitution, or enable individual States to legislate on subjects clearly within the powers of Congress, and to support that legislation even against subsequent acts of Congress upon the same subject.

The Chief Justice, in speaking of this act in the license cases, 5 Howard, p. 580, says:

" Undoubtedly Congress had the power, by assenting to the State laws then in force, to make them its own, and thus make the previous regulations of the States the regulations of the General Government. But it is equally clear, that, as to all future laws by the States, if the Constitution deprives them of the power of making any regulations on the subject, an act of Congress could not restore it; for it will hardly be contended that an act of Congress can alter the Constitution, and confer upon a State a power which the Constitution declares it shall not possess."

All that has been said applies equally to the case of the Consul. In addition to which we set up by plea, —

1. The coasting license.

2. That she was bound from one port in the United States, to another port in the United States.

Let it be granted that the power to regulate commerce is not so exclusive as to prevent State legislation, in the absence of legislation by Congress.

Yet Congress having legislated, so far as regards coasting vessels, by the act of 18th Feb., 1793, sect. 4, the Pennsylvania act of 29th March, 1803, sect. 29, which is in conflict therewith, is unconstitutional and void, so far as it relates to coasting vessels. 4 Smith's L., 76; 1 Stat. at Large, 305.

To make out these propositions, we argue,

First, That pilot-laws are regulations of commerce, within the meaning of the Constitution of the United States.

Second, That the act of Pensylvania is no exception to the general rule.

Third, That the act of Congress, 18th Feb., 1793, sect. 4, has regulated the navigation of coasting vessels, and limited the exactions to which vessels so employed can be subjected.

1. Regulations of navigation are regulations of commerce and within the jurisdiction of Congress.

" Commerce is intercourse. The power to regulate commerce extends to the regulation of navigation." Per Chief Justice Marshall, ·Gibbons v. Ogden, 9 Wheat. 189 ; see Id. 191, 192, 193.

Again, — Mr. Justice Johnson, Id. 229, says, " When speaking of the power of Congress over navigation, I do not regard it as a power incidental to that of regulating commerce ; I consider it as the thing itself ; inseparable from it, as vital motion is from vital existence."

This power comprehends navigation within the limits of every State in the Union. Id. 107. Norris v. The City of Boston, and Smith v. Turner, 7 How. 414, 415, 462.

Pilotage laws are regulations of navigation. They prescribe the terms of commercial or maritime intercourse. They take possession of the vessel as she appears upon the coast, or as soon as she leaves the wharf.

Clearly stated by Chief Justice Taney, License Cases, 5 How. 580. By Judge Rodgers, Flanigan v. The Insurance Company, 7 Barr. 311.

Congress has exercised the jurisdiction, and it has never been questioned. Act of Congress, 7th August, 1789, sect. 4, adopting the State laws then in force. 1 Stat. at Large, 53. Act of Congress, 2d March, 1837, c. 22, sect. 1, authorizing a navigator of waters, bounding two or more States, to employ a pilot duly authorized by either; any law or usage of the contrary notwithstanding. 5 Stat. at Large 153.

2. The act of Pennsylvania, 29th March, 1803, (in ques-
tion,) is no exception to the general rule, but is a clear regula-
tion of commerce.

It cannot be considered as an act to regulate the port police.
The very terms of the act forbid it being so considered.

The act is confined to vessels arriving from, or bound to for-
eign ports or places, and to vessels of seventy-five tons and up-
wards, sailing from, or bound to ports not within the river
Delaware.   Its principal force is expended without the port.

Suppose the obligation to take a pilot to be a regulation of
port police.

This act cannot be so considered, because it does not insist
on the pilot being employed, but suffers the parties to compound
by paying a certain sum for the support of an institution which
may, or may not be a good one.  Its operation is that of a
scheme to raise revenue for a particular purpose.   The charac-
ter of a police regulation is assumed and fallacious.

By the act 11th June, 1832, Pam. Laws, p. 620, vessels en-
gaged in the Pennsylvania coal trade are exempt from half
pilotage.  An invidious distinction in favor of a particular
branch of commerce, which shows the character of the whole
legislation.

3. Congress has legislated upon the subject by the act
18th Feb. 1793, sect. 4; 1 Stat. at Large, 305.  The State law is
at variance with this act, and must give way.

This section makes it the duty of collectors in their districts,
on application made and the fulfilment of certain conditions,
(the duty of six cents per ton being first paid,) to grant a license
for carrying on the coasting trade.

This act of Congress was passed by virtue of the power to
regulate commerce, and declares the terms upon which vessels
shall be entitled to a coasting license.

The license gives a right to trade, and does not merely confer
the American character.

" The enrolment of vessels designed for the coasting trade,
corresponds precisely with the registration of vessels designed
for the foreign trade, and requires every circumstance which
can constitute the American character.  The license can be
granted only to vessels already enrolled, if they be of the burden
of twenty tons and upwards, and requires no circumstances es-
sential to the American character.  " The object of the li-
cense, then, cannot be to ascertain the character of the vessel,
out to do what it professes to do ; — that is, to give permission
to a vessel, already proved by her enrolment to be American,
to carry on the coasting trade." Gibbons *v.* Ogden, 9 Wheat.
214.

The license to carry on the coasting trade, granted under this act, transfers to the licensed vessel all the right which the government can transfer, and limits the impositions with which such a trade may be burdened. Gibbons v. Ogden, 9 Wheat. 210, 211, 212, 213, 214, &c.

This is the main point ruled in Gibbons v. Ogden, and is unshaken, and of immense importance. The question arose on an act of the State of New York, giving to the heirs of Fulton, and those having license from them, the exclusive right to navigate the waters of New York by steam for a period of ten years.

The owners of two steamboats plying between New Jersey and New York, having a coasting license from the United States, contested the validity of the State act, and insisted upon their rights under their coasting license.

### Decree in Gibbons v. Ogden.

" This court is of opinion that the several licenses to the steamboats, the Stondinger and the Bellona, to carry on the coasting trade, which are set up by the appellant, Thomas Gibbons, in his answer to the bill of the respondent, Aaron Ogden, filed in the Court of Chancery in the State of New York, which were granted under an act of Congress, passed in pursuance of the Constitution of the United States, gave full authority to those vessels to navigate the waters of the United States by steam or otherwise, for the purpose of carrying on the coasting trade, any law of the State of New York to the contrary notwithstanding; and that so much of the several laws of the State of New York, as prohibit vessels licensed according to the laws of the United States, from navigating the waters of the State of New York, by means of fire or steam, is repugnant to the said Constitution, and void."

In our case, instead of purchasing a license from the heirs of Fulton, we are required to purchase a right of navigation by paying a tax to the State, or, what is the same thing, to an institution created by the State.

The decision in Gibbons v. Ogden has never been in the least degree questioned or shaken. Inferences, drawn from some expressions of the court in that case, which were supposed to imply that the States could not legislate on matters affecting commerce, even in the absence of any exerci e of their powers by Congress, are disavowed by perhaps a majority of the judges in the License Cases in 5 Howard. But the principle of the decision in Gibbons v. Ogden, upon which we rely, was not in the smallest degree impeached. On the contrary, it is expressly

26 *

adopted. Any other rule would be fatal to the peace of the country.

The 29th section of the act of the 29th March, 1803, is repugnant to the 5th clause of the 9th section of the 1st article of the Constitution of the United States, to wit: " No preference shall be given, by any regulation of commerce or revenue, to the ports of one State over those of another; nor shall vessels to or from one State, be obliged to enter, clear, or pay duties in another."

The Consul was bound from the port of Philadelphia to the port of New York; and under this act was required to pay the duty, tax, or toll in dispute.

A preference is given to the ports of Delaware, and to such ports of New Jersey as are within the river Delaware.

The counsel for the defendants in error contended that the law of Pennsylvania was not in violation of any provision of the Constitution.

I. Not of the third clause, 8th section, art. 1 (To regulate commerce, &c.)

Because,—1st. The act in question is no regulation of commerce. It v as passed in the exercise of a power of the State not granted or surrendered, to control the ports and harbors by which her commerce enters, and to protect the property and lives of those engaged in it. Gibbons *v*. Ogden, 9 Wheat. 208., It is local in character and object, an essential exercise of one branch of the police power of the State, to aid, and not to regulate commerce. City of New York *v*. Miln, 11 Pet. 132; Passenger Cases, 7 How. 402. 2d. Even if it be a regulation of commerce, the power of Congress is not exclusive. No conflicting legislation by Congress exists, and the State law is therefore valid. License Cases, 5 How. 504.

II. Nor to the first clause, 8th section, art. 1. (All duties, imposts, and excises, shall be uniform, throughout the United States.)

Because,—1st. This claus has reference to an exercise of power by Congress. The subject of pilotage is incapable of uniformity throughout all the States, and could not have been intended to be included in it. Passenger Cases, 7 How. 402; 2d. The sum demanded is not a duty, impost, or excise, in terms or in design. Brown *v*. State of Maryland, 12 Wheat. 419; License Cases, 5 How. 504. It is a compensation to the pilot for time, watchfulness, labor, and risk in seeking for the vessel and offering his services. Commonwealth *v*. Ricketson, 5 Met. 417, (Shaw, C. J.) 3d. Nor is there any such constitutional obligation upon the States, in the absence of legislation by Congress, to legislate uniformly as to duties, imposts, or excises, (as is submitted by brief of plaintiff in error.)

Cooley v. Board of Wardens of Port of Philadelphia et al.

III. Nor to the first and the second clause of the 10th section, art. 1. ' (No State shall, without the consent of Congress, lay any imposts or duties on imports or exports, &c., or of tonnage.)

If the law in question does regulate commerce at all, it is contended, that it does so by the means specified in these clauses. But they do not affect it, —

Because, — 1st. The sum demanded is neither a duty or impost on imports or exports, (already referred to,) nor a duty of tonnage. Nor does Brown v. The State of Maryland, 12 Wheat. 419, apply to the case, for it was decided upon the ground that a duty upon imports was laid without the consent of Congress. Here there is no duty (as already contended) nor impost charged, and Congress has consented, by act of 1789, (next referred to,) and of act of 1837. Nor is it material that the defendant is the consignee; if the power exist to require payment of the sum demanded, the person by whom it is to be paid, whether captain, mate, owner or consignee, is immaterial. It is no more or no less a duty upon imports or tax of tonnage, (if it be either,) whether paid by or chargeable upon either. — 2d. If it be either, or both, Congress have consented to its being laid. Act of Congress, 7th Aug. 1789, 1 Stat. at Large, 53; Id. 2d March, 1837, 5 Stat. at Large, 153.

Congress may, — 1st. Adopt State legislation. Gibbons. v. Ogden, 9 Wheat. 207; Passenger Cases, 7 How. 402; License Cases, 5 How. 580, — 2d. Where the authority is given by the Constitution, consent to the exercise of State power. The extract from the opinion of the Chief Justice is misapplied; it was addressed to the question of the exclusive power of Congress to regulate commerce, and not to the authority given by the Constitution to consent to the laying of imposts or duties on imports or exports or on tonnage by the States. Such consent may either be by adoption of existing, or by the grant of authority to make future laws, — 3d. If the sum demanded be a duty on imports or on tonnage, the act in question does not transcend the consent given, and is properly part of a system for the regulation of pilots.

A reference to the European codes, as well as legislation by the States, will show this.

I. European. — 1st. Hanseatic Ordinances, (about A. D. 1457,) ch. 25. Captain to take pilot under penalty (" amende ") of one mark of gold. (II. 486.) — 2d. Maritime Law of Sweden, (about A. D. 1500.) 'Captain to take a pilot, and if he neglects to do so, shall pay one hundred and fifty thalers, one third to the informer, one third to the sufferer (" plaig'nans ") or pilot offering, and one third to the poor mariners. (Cap. 7, III. 172.) — 3d. Maritime Law of Du Pays Bas. Captain to take pilot, under

penalty of fifty reals, and be responsible for any loss to the vessel. (Cap. 24, tit. 9, IV. 83.) — 4th. Maritime Law of France. Ordinances Louis XIV. (A. D. 1681,) ch. 26. If the mariners refuse a pilot, they shall suffer corporal punishment, and the one who tenders himself must be employed. And provides also for the examination of pilots by competent persons. (IV. 395.) Moreover, they who are engaged in navigating royal vessels into ports or rivers have not the option of taking or refusing a pilot; in the same case merchant vessels are required to take pilots, under the penalty of fifty livres, to be applied to the Marine Hospital, and the repairing of any damage from stranding. (Art. 5, tit. 1, livre II. ordinance of April, 1689. See Repertoire de Jurisprudence, tome 9, p. 236.) — 5th. England, (A. D. 1716,) 3 Geo. I. ch. 13. A penalty of £20 if piloted by any but a licensed pilot, to be received for the use of superannuated pilots, or the widows of pilots.

The obligation on the captain to take a pilot or to be responsible for the damage, and punishment of pilots for negligence, will also be found in, — 1st. Roman Law Digest, book 19, tit. 2, Edict Ulpianus. I. 110. — 2d. Laws made at Oleron. I. 232. — 3d. Consulate de la Mer. II. 250. — 4th. Maritime Law of Denmark. III. 262. (Pardessus)

II. The United States. — Acts in which provision, more or less extensive, is made for payment of a sum when no pilot is taken.

1st. Massachusetts: Act 1783, ch. 110, sects. 4, 6, 7, 10; Rev. Sts. 295. — 2d. New York: Act Feb. 19, 1819, sect. 20. — 3d. New Jersey: Digest published 1847, p. 1054. — 4th. Delaware: Act 5th Feb. 1819; Acts published by authority, 1829, p. 433. — 6th. Maryland: Act November Sessions, 1803; 1 Dorsey, 483. — 7th. Virginia: 10th Feb. 1820; 15th Feb. 1820; Revised Code, 123, 515; Supplement to Id. p. 386; Code 1849, p. 432. — 8th. North Carolina: Rev. Sts. 1836–7, p. 461, vol. 1. — 9th. South Carolina: Trott's Laws, 613; 2 Cooper's Stat. at Large, pp. 51, (1690,) 127 (1617,) 173. — 10th. Georgia: Act 6th Dec. 1799, sect. 8. — 11th. Alabama. — 12th. Louisiana: Act 31st March, 1805; Lislet's Dig. 1828, p. 511. — 13th. Pennsylvania: Act Province of Pennsylvania, 6 Geo. 3, ch. 5, passed Feb. 8, 1766.

(Copy of material sections annexed, No. 2.) Continued and supplied in some details by intervening acts, in all of which provision is made for payment in case no pilot is taken, and act of 29th March, 1803. (The law in question.) By State judicial decisions it is also so regarded as part of a system for the regulation of pilots. And the laws have been acted upon as a valid exercise of State power, either inherent or concurrent, or to which Congress had given consent. Commonwealth v. Ricketson, 5 Met. 416; 8 Met. 329; 9 Met. 371; 12 Met. 346; 13 Wend. 64; R. M. Charlton, 307.

Cooley *v.* Board of Wardens of Port of Philadelphia et al.

These laws having then the consent of Congress, and not exceeding the power of Congress, are to be regarded as though passed by Congress.

IV. Nor is the act in question repugnant to the 5th clause of the 9th section of the 1st article. (No preference shall be given, by any regulation of commerce or revenue, to the ports of one State over those of another; nor shall vessels bound to or from one State be obliged to enter, clear, or pay duties in another,)

Because, — 1st, the clause refers to the power of Congress (and the right to pass such laws remains, as already submitted, with the States.) Nor is the act, as contended, a regulation of commerce or revenue. — 2d. The law does not (from whatever fountain of power derived) give a preference to the ports of one State over those of another; it limits the demand to those cases where the labor, skill, and risk of the pilot is really required; nor would such preference, if it exist, render the residue of the law invalid. — 3d. The sum demanded is not a duty which vessels, bound to or from one State to another, are obliged to pay.

V. Nor does the act of Congress (18th Feb. 1793, coasting license; the Consul, No. 100) conflict with the law in question. It is averred to do so, inasmuch as the act of Pennsylvania is contended to be a regulation of commerce, and that by the law relative to coasting vessels, Congress has legislated upon and regulated their navigation, and by such legislation has exempted them from the sum demanded.

But, 1st, — The act in question, as already submitted, is not a regulation of commerce. — 2d. Even if it be, the act of Congress, Feb. 18, 1793, was not legislation upon, nor directed towards the same subject-matter, and did not therefore exclude the inherent or the coexisting power of the States, nor affect the consent given by the act of 1789.

The act of 1793 was intended either to give or to limit to certain vessels, defined commercial privileges. If to give the right, it was to enter and navigate the ports and harbors of the United States, at a less tonnage-duty, and without the necessity of entry on every voyage. If it was to limit a preëxisting right to trade, it licensed such trade at less than the ordinary tonnage-duties, and relieved from the necessity of entry at every voyage, as required of all other vessels. Beyond this, nothing. It did not, in its policy or by its words, affect or legislate in reference to harbor, nor health, nor quarantine regulations, nor profess to interfere with pilotage, nor repeal the act of 1789, nor revoke the consent it contained.

Gibbons *v.* Ogden, 9 Wheat. 208, does not sustain the position as contended for, that such vessels are discharged by virtue of a coasting license, from liability to such regulations of police or commerce (if any) which a State may enact, nor especially

from such tonnage-tax or duty on imports (if this be either) as Congress has consented that the State may establish.

Here, in effect, the question is between two acts of Congress, one by enactment, and the other by adoption or consent, but of equal authority. So regarding them, the provisions of the one do not limit, contradict, or affect those of the other.

Nor is the act of Feb. 18, 1793, repugnant to the statute in question, regarded as the act of Pennsylvania alone. Such repugnance must be direct, and these acts are not even inconsistent. Pilots and their regulation, which include an examination as to their competency, their licenses, their rewards and their punishments, form the subject of the State law.

The encouragement of a particular branch of commerce, its regulation, the privileges conferred, and the penalties for infractions, are the subject of the act of Congress; the one aids, and does not conflict with the other.

The only legislation by Congress upon pilots or pilotage, since the act of 1789, is the act of 2d March, 1837. 5 Stat. at Large, 153. This was directed to " alter a single provision of the New York law, leaving the residue of its provisions untouched." Chief Justice Taney, 5 How. 580.

The provisions of the statutes of New York have been referred to, and included in them coasting vessels above a certain tonnage. Stat. N. Y. Feb. 19, 1819; Act Oct. 16, 1830; 13 Wend. Rep. 64. And the laws of the other States referred to were then in force.

The act of 1793, as to coasters, was not regarded by Congress, therefore, as being in conflict with an act requiring payment by them of half-pilotage, nor as requiring any revocation of the consent already granted, or any further legislation.

The validity of these laws has been repeatedly, and, it is believed uniformly acknowledged by counsel and by the court, wherever referred to, as justified either by the inherent or coexisting power of the State to regulate commerce, or under the act of 1789. Gibbons *v.* Ogden, 9 Wheat. 18, 203, 207; New York *v.* Miln, 11 Pet. 149;–License Cases, 5 How. 380, 383; Passenger Cases, 7 How. 402, 470, 557.

Nor can the subsequent legislation of Pennsylvania, cited by the plaintiffs in error, affect the question presented on these records. The act of 1803 is alone before the court; the recent enactments may or may not be unconstitutional. When demands or exemptions are claimed in virtue of their provisions, their validity will form a proper subject for consideration.

Nor is the manner in which the fund is distributed after its collection material. The question is one of power merely, and if the sum demanded is justly within its limit, and not an

attempted evasion, under its color, the purpose to which it is applied, cannot make it more or less constitutional. If it was directed to be paid to the pilot offering his services, or the crew of his boat, it would not be more or less a valid enactment. Passenger Cases, 7 How. 495. The manner in which it is appropriated does but show more clearly the true character of the law.

Mr. Justice CURTIS delivered the opinion of the court.

These cases are brought here by writs of error to the Supreme Court of the Commonwealth of Pennsylvania.

They are actions to recover half-pilotage fees under the 29th section of the act of the Legislature of Pennsylvania, passed on the second day of March, 1803. The plaintiff in error alleges that the highest court of the State has decided against a right claimed by him under the Constitution of the United States. That right is to be exempted from the payment of the sums of money demanded, pursuant to the State law above referred to, because that law contravenes several provisions of the Constitution of the United States.

The particular section of the State law drawn in question is as follows:

" That every ship or vessel arriving from or bound to any foreign port or place, and every ship or vessel of the burden of seventy-five tons or more, sailing from or bound to any port not within the river Delaware, shall be obliged to receive a pilot. And it shall be the duty of the master of every such ship or vessel, within thirty-six hours next after the arrival of such ship or vessel at the city of Philadelphia, to make report to the master-warden of the name of such ship or vessel, her draught of water, and the name of the pilot who shall have conducted her to the port. And when any such vessel shall be outward-bound, the master of such vessel shall make known to the wardens the name of such vessel, and of the pilot who is to conduct her to the capes, and her draught of water at that time. And it shall be the duty of the wardens to enter every such vessel in a book to be by them kept for that purpose, without fee or reward. And if the master of any ship or vessel shall neglect to make such report, he shall forfeit and pay the sum of sixty dollars. And if the master of any such ship or vessel shall refuse or neglect to take a pilot, the master, owner or consignee of such vessel shall forfeit and pay to the warden aforesaid, a sum equal to the half-pilotage of such ship or vessel, to the use of the Society for the Relief, &c., to be recovered as pilotage in the manner hereinafter directed: Provided always, that where it shall appear to the warden that, in case of an inward-bound vessel, a pilot did

not offer before she had reached Reedy Island; or, in case of an outward-bound vessel, that a pilot could not be obtained for twenty-four hours after such vessel was ready to depart, the penalty aforesaid, for not having a pilot, shall not be incurred." It constitutes one section of " An act to establish a Board of Wardens for the port of Philadelphia, and for the regulation of Pilots and Pilotages, &c.," and the scope of the act is in conformity with the title to regulate the whole subject of the pilotage of that port.

We think this particular regulation concerning half-pilotage fees, is an appropriate part of a general system of regulations of this subject. Testing it by the practice of commercial States and countries legislating on this subject, we find it has usually been deemed necessary to make similar provisions. Numerous laws of this kind are cited in the learned argument of the counsel for the defendant in error; and their fitness, as a part of a system of pilotage, in many places, may be inferred from their existence in so many different States and countries. Like other laws they are framed to meet the most usual cases, *quæ frequentius accidunt;* they rest upon the propriety of securing lives and property exposed to the perils of a dangerous navigation, by taking on board a person peculiarly skilled to encounter or avoid them; upon the policy of discouraging the commanders of vessels from refusing to receive such persons on board at the proper times and places; and upon the expediency, and even intrinsic justice, of not suffering those who have incurred labor, and expense, and danger, to place themselves in a position to render important service generally necessary, to go unrewarded, because the master of a particular vessel either rashly refuses their proffered assistance, or, contrary to the general experience, does not need it. There are many cases, in which an offer to perform, accompanied by present ability to perform, is deemed by law equivalent to performance. The laws of commercial States and countries have made an offer of pilotage-service one of those cases; and we cannot pronounce a law which does this, to be so far removed from the usual and fit scope of laws for the regulation of pilots and pilotage, as to be deemed, for this cause, a covert attempt to legislate upon another subject under the appearance of legislating on this one.

It is urged that the second section of the act of the Legislature of Pennsylvania, of the 11th of June, 1832, proves that the State had other objects in view than the regulation of pilotage. That section is as follows:

" And be it further enacted, by the authority aforesaid, that from and after the first day of July next, no health-fee or half-pilotage shall be charged on any vessel engaged in the Pennsylvania coal trade."

It must be remembered, that the fair objects of a law imposing half-pilotage when a pilot is not received, may be secured, and at the same time some classes of vessels exempted from such charge. Thus the very section of the act of 1803, now under consideration, does not apply to coasting vessels of less burden than seventy-five tons, nor to those bound to, or sailing from, a port in the river Delaware. The purpose of the law being to cause masters of such vessels as generally need a pilot, to employ one, and to secure to the pilots a fair remuneration for cruising in search of vessels, or waiting for employment in port, there is an obvious propriety in having reference to the number, size, and nature of employment of vessels frequenting the port; and it will be found, by an examination of the different systems of these regulations, which have from time to time been made in this and other countries, that the legislative discretion has been constantly exercised in making discriminations, founded on differences both in the character of the trade, and the tonnage of vessels engaged therein.

We do not perceive any thing in the nature or extent of this particular discrimination in favor of vessels engaged in the coal trade, which would enable us to declare it to be other than a fair exercise of legislative discretion, acting upon the subject of the regulation of the pilotage of this port of Philadelphia, with a view to operate upon the masters of those vessels, who, as a general rule, ought to take a pilot, and with the further view of relieving from the charge of half-pilotage, such vessels as from their size, or the nature of their employment, should be exempted from contributing to the support of pilots, except so far as they actually receive their services. In our judgment, though this law of 1832 has undoubtedly modified the 29th section of the act of 1803, and both are to be taken together as giving the rule on this subject of half-pilotage, yet this change in the rule has not changed the nature of the law, nor deprived it of the character and attributes of a law for the regulation of pilotage.

Nor do we consider that the appropriation of the sums received under this section of the act, to the use of the society for the relief of distressed and decayed pilots, their widows and children, has any legitimate tendency to impress on it the character of a revenue law. Whether these sums shall go directly to the use of the individual pilots by whom the service is tendered, or shall form a common fund, to be administered by trustees for the benefit of such pilots and their families as may stand in peculiar need of it, is a matter resting in legislative discretion, in the proper exercise of which the pilots alone are interested.

For these reasons, we cannot yield our assent to the argument, that this provision of law is in conflict with the second

and third clauses of the tenth section of the first article of the Constitution, which prohibit a State, without the assent of Congress, from laying any imposts or duties, on imports or exports, or tonnage. This provision of the Constitution was intended to operate upon subjects actually existing and well understood when the Constitution was formed. Imposts and duties on imports, exports, and tonnage were then known to the commerce of a civilized world to be as distinct from fees and charges for pilotage, and from the penalties by which commercial States enforced their pilot-laws, as they were from charges for wharfage or towage, or any other local port-charges for services rendered to vessels or cargoes; and to declare that such pilot-fees or penalties, are embraced within the words imposts or duties on imports, exports, or tonnage, would be to confound things essentially different, and which must have been known to be actually different by those who used this language. It cannot be denied that a tonnage-duty, or an impost on imports or exports, may be levied under the name of pilot-dues or penalties; and certainly it is the thing, and not the name, which is to be considered. But, having previously stated that, in this instance, the law complained of does not pass the appropriate line which limits laws for the regulation of pilots and pilotage, the suggestion, that this law levies a duty on tonnage or on imports or exports, is not admissible; and, if so, it also follows, that this law is not repugnant to the first clause of the eighth section of the first article of the Constitution, which declares that all duties, imposts, and excises shall be uniform throughout the United States; for, if it is not to be deemed a law levying a duty, impost, or excise, the want of uniformity throughout the United States is not objectionable. Indeed the necessity of conforming regulations of pilotage to the local peculiarities of each port, and the consequent impossibility of having its charges uniform throughout the United States, would be sufficient of itself to prove that they could not have been intended to be embraced within this clause of the Constitution; for it cannot be supposed uniformity was required, when it must have been known to be impracticable.

It is further objected, that this law is repugnant to the fifth clause of the ninth section of the first article of the Constitution, viz. — "No preference shall be given by any regulation of commerce or revenue, to the ports of one State over those of another; nor shall vessels, to or from one State, be obliged to enter, clear, or pay duties in another."

But, as already stated, pilotage-fees are not duties within the meaning of the Constitution; and, certainly, Pennsylvania does not give a preference to the port of Philadelphia, by requiring

Cooley *v.* Board of Wardens of Port of Philadelphia et al.

the masters, owners, or consignees of vessels sailing to or from that port, to pay the charges imposed by the twenty-ninth section of the act of 1803. It is an objection to, and not a ground of preference of a port, that a charge of this kind must be borne by vessels entering it; and, accordingly, the interests of the port require, and generally produce, such alleviations of these charges as its growing commerce from time to time renders consistent with the general policy of the pilot-laws. This State, by its act of the 24th of March, 1851, has essentially modified the law of 1803, and further exempted many vessels from the charge now in question. Similar changes may be observed in the laws of New York, Massachusetts, and other commercial States, and they undoubtedly spring from the conviction that burdens of this kind, instead of operating to give a preference to a port, tend to check its commerce, and that sound policy requires them to be lessened and removed as early as the necessities of the system will allow.

In addition to what has been said respecting each of these constitutional objections to this law, it may be observed, that similar laws have existed and been practised on in the States since the adoption of the federal Constitution; that, by the act of the 7th of August, 1789, (1 Stat. at Large, 54,) Congress declared that all pilots in the bays, inlets, rivers, harbors, and ports of the United States, shall continue to be regulated in conformity with the existing laws of the States, &c.; and that this contemporaneous construction of the Constitution since acted on with such uniformity in a matter of much public interest and importance, is entitled to great weight, in determining whether such a law is repugnant to the Constitution, as levying a duty not uniform throughout the United States, or, as giving a preference to the ports of one State over those of another, or, as obliging vessels to or from one State to enter, clear, or pay duties in another. Stuart *v.* Laird, 1 Cranch, 299; Martin *v.* Hunter, 1 Wheat. 304; Cohens *v.* The Commonwealth of Virginia, 6 Wheat. 264; Prigg *v.* The Commonwealth of Pennsylvania, 16 Pet. 621.

The opinion of the court is, that the law now in question is not repugnant to either of the above-mentioned clauses of the Constitution.

It remains to consider the objection, that it is repugnant to the third clause of the eighth section of the first article. " The Congress shall have power to regulate commerce with foreign nations and among the several States, and with the Indian tribes."

That the power to regulate commerce includes the regulation of navigation, we consider settled. And when we look to the

nature of the service performed by pilots, to the relations which that service and its compensations bear to navigation between the several States, and between the ports of the United States and foreign countries, we are brought to the conclusion, that the regulation of the qualifications of pilots, of the modes and times of offering and rendering their services, of the responsibilities which shall rest upon them, of the powers they shall possess, of the compensation they may demand, and of the penalties by which their rights and duties may be enforced, do constitute regulations of navigation, and consequently of commerce, within the just meaning of this clause of the Constitution.

The power to regulate navigation is the power to prescribe rules in conformity with which navigation must be carried on. It extends to the persons who conduct it, as well as to the instruments used. Accordingly, the first Congress assembled under the Constitution passed laws, requiring the masters of ships and vessels of the United States to be citizens of the United States, and established many rules for the government and regulation of officers and seamen. 1 Stat. at Large, 55, 131. These have been from time to time added to and changed, and we are not aware that their validity has been questioned.

Now, a pilot, so far as respects the navigation of the vessel in that part of the voyage which is his pilotage-ground, is the temporary master charged with the safety of the vessel and cargo, and of the lives of those on board, and intrusted with the command of the crew. He is not only one of the persons engaged in navigation, but he occupies a most important and responsible place among those thus engaged. And if Congress has power to regulate the seamen who assist the pilot in the management of the vessel, a power never denied, we can perceive no valid reason why the pilot should be beyond the reach of the same power. It is true that, according to the usages of modern commerce on the ocean, the pilot is on board only during a part of the voyage between ports of different States, or between ports of the United States and foreign countries; but if he is on board for such a purpose and during so much of the voyage as to be engaged in navigation, the power to regulate navigation extends to him while thus engaged, as clearly as it would if he were to remain on board throughout the whole passage, from port to port. For it is a power which extends to every part of the voyage, and may regulate those who conduct or assist in conducting navigation in one part of a voyage as much as in another part, or during the whole voyage.

Nor should it be lost sight of, that this subject of the regulation of pilots and pilotage has an intimate connection with, and an important relation to, the general subject of commerce with

foreign nations and among the several States, over which it was one main object of the Constitution to create a national control.    Conflicts between the laws of neighboring States, and discriminations favorable or adverse to commerce with particular foreign nations, might be created by State laws regulating pilotage, deeply affecting that equality of commercial rights, and that freedom from State interference, which those who formed the Constitution were so anxious to secure, and which the experience of more than half a century has taught us to value so highly.    The apprehension of this danger is not speculative merely.  For, in 1837, Congress actually interposed to relieve the commerce of the country from serious embarrassment, arising from the laws of different States, situate upon waters which are the boundary between them.    This was done by an enactment of the 2d of March, 1837, in the following words:

" Be it enacted, that it shall and may be lawful for the master or commander of any vessel coming into or going out of any port situate upon waters which are the boundary between two States, to employ any pilot duly licensed or authorized by the laws of either of the States bounded on the said waters, to pilot said vessel to or from said port, any law, usage, or custom, to the contrary, notwithstanding."

The act of 1789, (1 Stat. at Large, 54,) already referred to, contains a clear legislative exposition of the Constitution by the first Congress, to the effect that the power to regulate pilots was conferred on Congress by the Constitution; as does also the act of March the 2d, 1837, the terms of which have just been given.  The weight to be allowed to this contemporaneous construction, and the practice of Congress under it, has, in another connection, been adverted to.  And a majority of the court are of opinion, that a regulation of pilots is a regulation of commerce, within the grant to Congress of the commercial power, contained in the third clause of the eighth section of the first article of the Constitution.

It becomes necessary, therefore, to consider whether this law of Pennsylvania, being a regulation of commerce, is valid.

The act of Congress of the 7th of August, 1789, sect. 4, is as follows:

" That all pilots in the bays, inlets, rivers, harbors, and ports of the United States shall continue to be regulated in conformity with the existing laws of the States, respectively, wherein such pilots may be, or with such laws as the States may respectively hereafter enact for the purpose, until further legislative provision shall be made by Congress."

If the law of Pennsylvania, now in question, had been in existence at the date of this act of Congress, we might hold it to

27 *

have been adopted by Congress, and thus made a law of the United States, and so valid. Because this act does, in effect, give the force of an act of Congress, to the then existing State laws on this subject, so long as they should continue unrepealed by the State which enacted them.

But the law on which these actions are founded was not enacted till 1803. What effect then can be attributed to so much of the act of 1789, as declares, that pilots shall continue to be regulated in conformity, " with such laws as the States may respectively hereafter enact for the purpose, until further legislative provision shall be made by Congress " ?

If the States were divested of the power to legislate on this subject by the grant of the commercial power to Congress, it is plain this act could not confer upon them power thus to legislate. If the Constitution excluded the States from making any law regulating commerce, certainly Congress cannot regrant, or in any manner reconvey to the States that power. And yet this act of 1789 gives its sanction only to laws enacted by the States. This necessarily implies a constitutional power to legislate ; for only a rule created by the sovereign power of a State acting in its legislative capacity, can be deemed a law, enacted by a State ; and if the State has so limited its sovereign power that it no longer extends to a particular subject, manifestly it cannot, in any proper sense, be said to enact laws thereon. Entertaining these views we are brought directly and unavoidably to the consideration of the question, whether the grant of the commercial power to Congress, did *per se* deprive the States of all power to regulate pilots. This question has never been decided by this court, nor, in our judgment, has any case depending upon all the considerations which must govern this one, come before this court. The grant of commercial power to Congress does not contain any terms which expressly exclude the States from exercising an authority over its subject-matter. If they are excluded it must be because the nature of the power, thus granted to Congress, requires that a similar authority should not exist in the States. If it were conceded on the one side, that the nature of this power, like that to legislate for the District of Columbia, is absolutely and totally repugnant to the existence of similar power in the States, probably no one would deny that the grant of the power to Congress, as effectually and perfectly excludes the States from all future legislation on the subject, as if express words had been used to exclude them. And on the other hand, if it were admitted that the existence of this power in Congress, like the power of taxation, is compatible with the existence of a similar power in the States, then it would be in conformity with the contemporary exposition of the Constitution, (Federalist, No. 32,)

and with the judicial construction, given from time to time by this court, after the most deliberate consideration, to hold that the mere grant of such a power to Congress, did not imply a prohibition on the States to exercise the same power; that it is not the mere existence of such a power, but its exercise by Congress, which may be incompatible with the exercise of the same power by the States, and that the States may legislate in the absence of congressional regulations. Sturges v. Crowninshield, 4 Wheat. 193; Moore v. Houston, 5 Wheat. 1; Wilson v. Blackbird Creek Co. 2 Peters, 251.

The diversities of opinion, therefore, which have existed on this subject, have arisen from the different views taken of the nature of this power. But when the nature of a power like this is spoken of, when it is said that the nature of the power requires that it should be exercised exclusively by Congress, it must be intended to refer to the subjects of that power, and to say they are of such a nature as to require exclusive legislation by Congress. Now the power to regulate commerce, embraces a vast field, containing not only many, but exceedingly various subjects, quite unlike in their nature; some imperatively demanding a single uniform rule, operating equally on the commerce of the United States in every port; and some, like the subject now in question, as imperatively demanding that diversity, which alone can meet the local necessities of navigation.

Either absolutely to affirm, or deny that the nature of this power requires exclusive legislation by Congress, is to lose sight of the nature of the subjects of this power, and to assert concerning all of them, what is really applicable but to a part. Whatever subjects of this power are in their nature national, or admit only of one uniform system, or plan of regulation, may justly be said to be of such a nature as to require exclusive legislation by Congress. That this cannot be affirmed of laws for the regulation of pilots and pilotage is plain. The act of 1789 contains a clear and authoritative declaration by the first Congress, that the nature of this subject is such, that until Congress should find it necessary to exert its power, it should be left to the legislation of the States; that it is local and not national; that it is likely to be the best provided for, not by one system, or plan of regulations, but by as many as the legislative discretion of the several States should deem applicable to the local peculiarities of the ports within their limits.

Viewed in this light, so much of this act of 1789 as declares that pilots shall continue to be regulated " by such laws as the States may respectively hereafter enact for that purpose," instead of being held to be inoperative, as an attempt to confer on the States a power to legislate, of which the Constitution had de-

prived them, is allowed an appropriate and important significa-
tion. It manifests the understanding of Congress, at the out-
set of the government, that the nature of this subject is not
such as to require its exclusive legislation. The practice of the
States, and of the national government, has been in conformity
with this declaration, from the origin of the national govern-
ment to this time; and the nature of the subject when examined,
is such as to leave no doubt of the superior fitness and propriety,
not to say the absolute necessity, of different systems of regula-
tion, drawn from local knowledge and experience, and conformed
to local wants. How then can we say, that by the mere grant
of power to regulate commerce, the States are deprived of all the
power to legislate on this subject, because from the nature of the
power the legislation of Congress must be exclusive. This
would be to affirm that the nature of the power is in any case,
something different from the nature of the subject to which, in
such case, the power extends, and that the nature of the power
necessarily demands, in all cases, exclusive legislation by Con-
gress, while the nature of one of the subjects of that power, not
only does not require such exclusive legislation, but may be best
provided for by many different systems enacted by the States, in
conformity with the circumstances of the ports within their limits.
In construing an instrument designed for the formation of a go-
vernment, and in determining the extent of one of its important
grants of power to legislate, we can make no such distinction
between the nature of the power and the nature of the subject
on which that power was intended practically to operate, nor con-
sider the grant more extensive by affirming of the power, what
is not true of its subject now in question.

It is the opinion of a majority of the court that the mere grant
to Congress of the power to regulate commerce, did not deprive
the States of power to regulate pilots. and that although Con-
gress has legislated on this subject, its legislation manifests an
intention, with a single exception, not to regulate this subject,
but to leave its regulation to the several States. To these pre-
cise questions, which are all we are called on to decide, this opi-
nion must be understood to be confined. It does not extend to
the question what other subjects, under the commercial power,
are within the exclusive control of Congress, or may be regu-
lated by the States in the absence of all congressional legislation;
nor to the general question how far any regulation of a subject
by Congress, may be deemed to operate as an exclusion of all
legislation by the States upon the same subject. We decide the
precise questions before us, upon what we deem sound princi-
ples, applicable to this particular subject in the state in which
the legislation of Congress has left it. We go no further.

Cooley *v.* Board of Wardens of Port of Philadelphia et al.

We have not adverted to the practical consequences of holding that the States possess no power to legislate for the regulation of pilots, though in our apprehension these would be of the most serious importance. For more than sixty years this subject has been acted on by the States, and the systems of some of them created and of others essentially modified during that period. To hold that pilotage fees and penalties demanded and received during that time, have been illegally exacted, under color of void laws, would work an amount of mischief which a clear conviction of constitutional duty, if entertained, must force us to occasion, but which could be viewed by no just mind without deep regret. Nor would the mischief be limited to the past. If Congress were now to pass a law adopting the existing State laws, if enacted without authority, and in violation of the Constitution, it would seem to us to be a new and questionable mode of legislation.

If the grant of commercial power in the Constitution has deprived the States of all power to legislate for the regulation of pilots, if their laws on this subject are mere usurpations upon the exclusive power of the general government, and utterly void, it may be doubted whether Congress could, with propriety, recognize them as laws, and adopt them as its own acts; and how are the legislatures of the States to proceed in future, to watch over and amend these laws, as the progressive wants of a growing commerce will require, when the members of those legislatures are made aware that they cannot legislate on this subject without violating the oaths they have taken to support the Constitution of the United States?

We are of opinion that this State law was enacted by virtue of a power, residing in the State to legislate; that it is not in conflict with any law of Congress; that it does not interfere with any system which Congress has established by making regulations, or by intentionally leaving individuals to their own unrestricted action; that this law is therefore valid, and the judgment of the Supreme Court of Pennsylvania in each case must be affirmed.

Mr. Justice McLean and Mr. Justice Wayne dissented; and Mr. Justice Daniel, although he concurred in the judgment of the court, yet dissented from its reasoning.

Mr. Justice McLEAN.

It is with regret that I feel myself obliged to dissent from the opinion of a majority of my brethren in this case.

As expressing my views on the question involved, I will copy a few sentences from the opinion of Chief Justice Marshall in the opinion in Gibbons *v.* Ogden. "It has been said," says that

illustrious judge, " that the act of August 7th, 1789; acknowledges a concurrent power in the States to regulate the conduct of pilots, and hence is inferred an admission of their concurrent right with Congress to regulate commerce with foreign nations and amongst the States." " But this inference is not, we think, justified by the fact.

" Although Congress," he continues, " cannot enable a State to legislate, Congress may adopt the provisions of a State on any subject. When the government of the Union was brought into existence, it found a system for the regulation of its pilots in full force in every State. The act which has been mentioned, adopts this system, and gives it the same validity as if its provisions had been specially made by Congress. But the act, it may be said, is prospective also, and the adoption of laws to be in future presupposes the right in the maker to legislate on the subject."

" The act unquestionably manifests an intention to leave this subject entirely to the States, until Congress should think proper to interpose; but the very enactment of such a law indicates an opinion that it was necessary; that the existing system would not be applicable to the new state of things, unless expressly applied to it by Congress. But this section is confined to pilots within the bays, inlets, rivers, harbors, and ports of the United States, which are, of course, in whole or in part, also within the limits of some particular State. The acknowledged power of a State to regulate its police, its domestic trade, and to govern its own citizens, may enable it to legislate on this subject, to a considerable extent; and the adoption of its system by Congress, and the application of it to the whole subject of commerce, does not seem to the court to imply a right in the States so to apply it of their own authority. But the adoption of the State system being temporary, being only, " until further legislative provision shall be made by Congress," shows conclusively, an opinion that Congress could control the whole subject, and might adopt the system of the States or provide one of its own."

Why did Congress pass the act of 1789, adopting the pilot-laws of the respective States? Laws they unquestionably were, having been enacted by the States before the adoption of the Constitution. But were they laws under the Constitution? If they had been so considered by Congress, they would not have been adopted by a special act. There is believed to be no instance in the legislation of Congress, where a State law has been adopted, which, before its adoption, applied to federal powers. To suppose such a case, would be an imputation of ignorance as to federal powers, least of all chargeable against the men who formed the Constitution and who best understood it.

Congress adopted the pilot-laws of the States, because it was

well understood, they could have had no force, as regulations of foreign commerce or of commerce among the States, if not so adopted. By their adoption they were made acts of Congress, and ever since they have been so considered and enforced.

Each State regulates the commerce within its limits; which is not within the range of federal powers. So far, and no farther could effect have been given to the pilot laws of the States, under the Constitution. But those laws were only adopted "until further legislative provisions shall be made by Congress."

This shows that Congress claimed the whole commercial power on this subject, by adopting the pilot laws of the States, making them acts of Congress; and also by declaring that the adoption was only until some further legislative provision could be made by Congress.

Can Congress annul the acts of a State passed within its admitted sovereignty? No one, I suppose, could sustain such a proposition. State sovereignty can neither be enlarged nor diminished by an act of Congress. It is not known that Congress has ever claimed such a power.

If the States had not the power to enact pilot laws, as connected with foreign commerce, in 1789, when did they get it? It is an exercise of sovereign power to legislate. In this respect the Constitution is the same now as in 1789, and also the power of a State is the same. Whence, then, this enlargement of State power. Is it derived from the act of 1789, that pilots shall continue to be regulated "in conformity with such laws as the States may respectively hereafter enact"? In the opinion of the Chief Justice, above cited, it is said, Congress may adopt the laws of a State, but it cannot enable a State to legislate. In other words, it cannot transfer to a State legislative powers. And the court also say that the States cannot apply the pilot laws of their own authority. We have here, then, the deliberate action of Congress, showing that the States have no inherent power to pass these laws, which is affirmed by the opinion of this court.

Ought not this to be considered as settling this question? What more of authority can be brought to bear upon it? But it is said that Congress is incompetent to legislate on this subject. Is this so? Did not Congress, in 1789, legislate on the subject by adopting the State laws, and may it not do so again? Was not that a wise and politic act of legislation? This is admitted. But it is, said that Congress cannot legislate on this matter in detail. The act of 1789 shows that it is unnecessary for Congress so to legislate. A single section covers the whole legislation of the States, in regard to pilots. Where, then, is the necessity of recognizing this power to exist in the States? There is no such necessity; and if there were, it would not make the

act of the State constitutional; for it is admitted that the power is in Congress.

That a State may regulate foreign commerce, or commerce among the States, is a doctrine which has been advanced by individual judges of this court; but never before, I believe, has such a power been sanctioned by the decision of this court. In this case, the power to regulate pilots is admitted to belong to the commercial power of Congress; and yet it is held, that a State, by virtue of its inherent power, may regulate the subject, until such regulation shall be annulled by Congress. This is the principle established by this decision. Its language is guarded, in order to apply the decision only to the case before the court. But such restrictions can never operate, so as to render the principle inapplicable to other cases. And it is in this light that the decision is chiefly to be regretted. The power is recognized in the State, because the subject is more appropriate for State than Federal action; and consequently, it must be presumed the Constitution cannot have intended to inhibit State action. This is not a rule by which the Constitution is to be construed. It can receive but little support from the discussions which took place on the adoption of the Constitution, and none at all from the earlier decisions of this court.

It will be found that the principle in this case, if carried out, will deeply affect the commercial prosperity of the country. If a State has power to regulate foreign commerce, such regulation must be held valid, until Congress shall repeal or annul it. But the present case goes further than this. Congress regulated pilots by the act of 1789, which made the acts of the State, on that subject, the acts of Congress. In 1803, Pennsylvania passed the law in question, which materially modified the act adopted by Congress; and this act of 1803 is held to be constitutional. This, then, asserts the right of a State, not only to regulate foreign commerce, but to modify, and, consequently, to repeal a prior regulation of Congress. Is there a mistake in this statement? There is none, if an adopted act of a State is thereby made an act of Congress, and if the regulation of pilots, in regard to foreign commerce, be a regulation of commerce. The latter position is admitted in the opinion of the court, and no one will controvert the former. I speak of the principle of the opinion, and not of the restricted application given to it by the learned judge who delivered it.

The noted Blackbird Creek case shows what little influence the facts and circumstances of a case can have in restraining the principle it is supposed to embody.

How can the unconstitutional acts of Louisiana, or of any other State which has ports on the Mississippi, or the Ohio, or

Cooley v. Board of Wardens of Port of Philadelphia et al.

on any of our other rivers, be corrected, without the action of Congress? And when Congress shall act, the State has only to change its ground, in order to enact and enforce its regulations. Louisiana now imposes a duty upon vessels for mooring in the river opposite the city of New Orleans, which is called a levee tax, and which, on some boats performing weekly trips to that city, amounts to from $3,000 to $4,000 annually. What is there to prevent the thirteen or fourteen States bordering upon the two rivers first named, from regulating navigation on those rivers, although Congress may have regulated the same at some prior period? I speak not of the effect of this doctrine theoretically in this matter, but practically. And if the doctrine be true, how can this court say that such regulations of commerce are invalid? If this doctrine be sound, the passenger cases were erroneously decided. In those cases there was no direct conflict between the acts of the States taxing passengers and the acts of Congress.

From this race of legislation between Congress and the States, and between the States, if this principle be maintained, will arise a conflict similar to that which existed before the adoption of the Constitution. The States favorably situated, as Louisiana, may levy a contribution upon the commerce of other States, which shall be sufficient to meet the expenditures of the States.

The application of the money exacted under this act of Pennsylvania, it is said, shows that it is not raised for revenue. The application of the money cannot be relied on as showing an act of a State to be constitutional. If the State has power to pass the act it may apply the money raised in its discretion.

I think the charge of half-pilotage is correct under the circumstances, and I only object to the power of the State to pass the law. Congress, to whom the subject peculiarly belongs, should have been applied to, and no doubt it would have adopted the act of the State.

Mr. Justice DANIEL.

I agree with the majority in their decision, that the judgments of the Supreme Court of Pennsylvania in these cases, should be affirmed, though I cannot go with them in the process or argument by which their conclusion has been reached. The power and the practice of enacting pilot-laws, which has been exercised by the States from the very origin of their existence, although it is one in some degree connected with commercial intercourse, does not come essentially and regularly within that power of commercial regulation vested by the Constitution in Congress, and which by the Constitution must, when exercised by Congress, be enforced with perfect equality, and without any kind of dis-

crimination, local or otherwise, in its application.    The power delegated to Congress by the Constitution relates properly to the terms on which commercial engagements may be prosecuted; the character of the articles which they may embrace; the permission or terms according to which they may be introduced; and do not necessarily nor even naturally extend to the means of precaution and safety adopted within the waters or limits of the States by the authority of the latter for the preservation of vessels and cargoes, and the lives of navigators or passengers. These last subjects are essentially local — they must depend upon local necessities which call them into existence, must differ according to the degrees of that necessity.    It is admitted, on all hands, that they cannot be uniform or even general, but must vary so as to meet the purposes to be accomplished.    They have no connection with contract, or traffic, or with the permission to trade in any subject, or upon any conditions.    They belong to the same conservative power which undertakes to guide the track of the vessel over the rocks or shallows of a coast, or river; which directs her mooring or her position in port, for the safety of life and property, whether in reference to herself or to other vessels, their cargoes and crews, which for security against pestilence subjects vessels to quarantine, and may order the total destruction of the cargoes they contain.    This is a power which is deemed indispensable to the safety and existence of every community.    It may well be made a question, therefore, whether it could, under any circumstances, be surrendered; but certainly it is one which cannot be supposed to have been given by mere implication, and as incidental to another, to the exercise of which it is not indispensable.    It is not just nor philosophical to argue from the possibility of abuse against the rightful existence of this power in the States; such an argument would, if permitted, go to the overthrow of all power in either the States or in the federal government, since there is no power which may not be abused.    The true question here is, whether the power to enact pilot-laws is appropriate and necessary, or rather most appropriate and necessary to the State or the federal governments.    It being conceded that this power has been exercised by the States from their very dawn of existence; that it can be practically and beneficially applied by the local authorities only; it being conceded, as it must be, that the power to pass pilot-laws, as such, has not been in any express terms delegated to Congress, and does not necessarily conflict with the right to establish commercial regulations, I am forced to conclude that this is an original and inherent power in the States, and not one to be merely tolerated, or held subject to the sanction of the federal government.

This cause came on to be heard on the transcript of the record from the Supreme Court of Pennsylvania, for the Eastern District, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said Supreme Court in this cause be, and the same is hereby, affirmed, with costs.