(Slip Opinion) OCTOBER TERM, 2006 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## UNITED HAULERS ASSOCIATION, INC., ET AL. *v.* ONEIDA-HERKIMER SOLID WASTE MANAGEMENT AUTHORITY ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 05–1345.   Argued January 8, 2007—Decided April 30, 2007

Traditionally, municipalities in respondent Counties disposed of their own solid wastes, often via landfills that operated without permits and in violation of state regulations.  Facing an environmental crisis and an uneasy relationship with local waste management companies, the Counties requested and the State created respondent Authority. The Counties and the Authority agreed that the Authority would manage all solid waste in the Counties.  Private haulers could pick up citizens' trash, but the Authority would process, sort, and send it off for disposal.  The Authority would also provide other services, including recycling.  If the Authority's operating costs and debt service were not recouped through the "tipping fees" it charged, the Counties must make up the difference.  To avoid such liability, the Counties enacted "flow control" ordinances requiring private haulers to obtain permits to collect solid waste in the Counties and to deliver the waste to the Authority's sites.

Petitioners, a trade association and individual haulers, filed suit under 42 U. S. C. §1983, alleging that the flow control ordinances violate the Commerce Clause by discriminating against interstate commerce.  They submitted evidence that without the ordinances and the associated tipping fees, they could dispose of solid waste at out-of-state facilities for far less.  Ruling in the haulers' favor, the District Court held that nearly all flow control laws had been categorically rejected in *C & A Carbone, Inc.* v. *Clarkstown*, 511 U. S. 383, where this Court held that an ordinance forcing haulers to deliver waste to a particular private facility discriminated against interstate commerce.  Reversing, the Second Circuit held that *Carbone* and other of

this Court's so-called "dormant" Commerce Clause precedents allow for a distinction between laws that benefit public, as opposed to private, facilities.

*Held:* The judgment is affirmed.

261 F. 3d 245 and 438 F. 3d 150, affirmed.

THE CHIEF JUSTICE delivered the opinion of the Court with respect to Parts I, II–A, II–B, and II–C, concluding that the Counties' flow control ordinances, which treat in-state private business interests exactly the same as out-of-state ones, do not discriminate against interstate commerce. Pp. 6–13.

(a) To determine whether a law violates the dormant Commerce Clause, the Court first asks whether it discriminates on its face against interstate commerce. In this context, " 'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Systems, Inc.* v. *Department of Environmental Quality of Ore.*, 511 U. S. 93, 99. Discriminatory laws motivated by "simple economic protectionism" are subject to a "virtually *per se* rule of invalidity," *Philadelphia* v. *New Jersey*, 437 U. S. 617, 624, which can only be overcome by a showing that there is no other means to advance a legitimate local purpose, *Maine* v. *Taylor*, 477 U. S. 131, 138. P. 6.

(b) *Carbone* does not control this case. *Carbone* involved a flow control ordinance requiring that all nonhazardous solid waste within a town be deposited, upon payment of an above-market tipping fee, at a transfer facility run by a private contractor under an agreement with the town. See 511 U. S., at 387. The dissent there opined that the ostensibly private transfer station was "essentially a municipal facility," *id.,* at 419, and that this distinction should have saved the ordinance because favoring local government is different from favoring a particular private company. The majority's failure to comment on the public-private distinction does not prove, as the haulers' contend, that the majority agreed with the dissent's characterization of the facility, but thought there was no difference under the dormant Commerce Clause between laws favoring private entities and those favoring public ones. Rather, the *Carbone* majority avoided the issue because the transfer station was private, and therefore the question whether *public* facilities may be favored was not properly before the Court. The majority viewed the ordinance as "just one more instance of local processing requirements that we long have held invalid," *id.,* at 391, citing six local processing cases involving discrimination in favor of *private* enterprise. If the Court were extending this line of cases to cover discrimination in favor of local government, it could be expected to have said so. Thus, *Carbone* cannot be regarded as having decided the public-private question. Pp. 6–9.

Syllabus

(c) The flow control ordinances in this case do not discriminate against interstate commerce. Compelling reasons justify treating these laws differently from laws favoring particular private businesses over their competitors. "[A]ny notion of discrimination assumes a comparison of substantially similar entities," *General Motors Corp.* v. *Tracy*, 519 U. S. 278, 298, whereas government's important responsibilities to protect the health, safety, and welfare of its citizens set it apart from a typical private business, cf. *id.,* at 313. Moreover, in contrast to laws favoring in-state business over out-of-state competition, which are often the product of economic protectionism, laws favoring local government may be directed toward any number of legitimate goals unrelated to protectionism. Here, the ordinances enable the Counties to pursue particular policies with respect to waste handling and treatment, while allocating the costs of those policies on citizens and businesses according to the volume of waste they generate. The contrary approach of treating public and private entities the same under the dormant Commerce Clause would lead to unprecedented and unbounded interference by the courts with state and local government. The Counties' citizens could have left the entire matter of waste management services for the private sector, in which case any regulation they undertook could not discriminate against interstate commerce. But it was also open to them to vest responsibility for the matter with their government, and to adopt flow control ordinances to support the government effort. It is not the office of the Commerce Clause to control the voters' decision in this regard. The Court is particularly hesitant to interfere here because waste disposal is typically and traditionally a function of local government exercising its police power. Nothing in the Commerce Clause vests the responsibility for such a policy judgment with the Federal Judiciary. Finally, while the Court's dormant Commerce Clause cases often find discrimination when the burden of state regulation falls on interests outside the State, the most palpable harm imposed by the ordinances at issue—more expensive trash removal—will likely fall upon the very people who voted for the laws, the Counties' citizens. There is no reason to step in and hand local businesses a victory they could not obtain through the political process. Pp. 10–13.

ROBERTS, C. J., delivered the opinion of the Court, except as to Part II–D. SOUTER, GINSBURG, and BREYER, JJ., joined that opinion in full. SCALIA, J., filed an opinion concurring as to Parts I and II–A through II–C. THOMAS, J., filed an opinion concurring in the judgment. ALITO, J., filed a dissenting opinion, in which STEVENS and KENNEDY, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 05–1345

## UNITED HAULERS ASSOCIATION, INC., ET AL., PETITIONERS *v.* ONEIDA-HERKIMER SOLID WASTE MANAGEMENT AUTHORITY ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[April 30, 2007]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court, except as to Part II–D.

"Flow control" ordinances require trash haulers to deliver solid waste to a particular waste processing facility. In *C & A Carbone, Inc.* v. *Clarkstown*, 511 U. S. 383 (1994), this Court struck down under the Commerce Clause a flow control ordinance that forced haulers to deliver waste to a particular *private* processing facility. In this case, we face flow control ordinances quite similar to the one invalidated in *Carbone*. The only salient difference is that the laws at issue here require haulers to bring waste to facilities owned and operated by a state-created public benefit corporation. We find this difference constitutionally significant. Disposing of trash has been a traditional government activity for years, and laws that favor the government in such areas—but treat every private business, whether in-state or out-of-state, exactly the same—do not discriminate against interstate commerce for purposes of the Commerce Clause. Applying the Commerce Clause test reserved for regulations that do not

discriminate against interstate commerce, we uphold these ordinances because any incidental burden they may have on interstate commerce does not outweigh the benefits they confer on the citizens of Oneida and Herkimer Counties.

I

Located in central New York, Oneida and Herkimer Counties span over 2,600 square miles and are home to about 306,000 residents. Traditionally, each city, town, or village within the Counties has been responsible for disposing of its own waste. Many had relied on local landfills, some in a more environmentally responsible fashion than others.

By the 1980's, the Counties confronted what they could credibly call a solid waste "'crisis.'" Brief for Respondents 4. Many local landfills were operating without permits and in violation of state regulations. Sixteen were ordered to close and remediate the surrounding environment, costing the public tens of millions of dollars. These environmental problems culminated in a federal clean-up action against a landfill in Oneida County; the defendants in that case named over 600 local businesses and several municipalities and school districts as third-party defendants.

The "crisis" extended beyond health and safety concerns. The Counties had an uneasy relationship with local waste management companies, enduring price fixing, pervasive overcharging, and the influence of organized crime. Dramatic price hikes were not uncommon: In 1986, for example, a county contractor doubled its waste disposal rate on six weeks' notice.

Responding to these problems, the Counties requested and New York's Legislature and Governor created the Oneida-Herkimer Solid Waste Management Authority (Authority), a public benefit corporation. See N. Y. Pub.

Auth. Law Ann. §2049–aa *et seq.* (West 1995). The Authority is empowered to collect, process, and dispose of solid waste generated in the Counties. §2049–ee(4). To further the Authority's governmental and public purposes, the Counties may impose "appropriate and reasonable limitations on competition" by, for instance, adopting "local laws requiring that all solid waste . . . be delivered to a specified solid waste management-resource recovery facility." §2049–tt(3).

In 1989, the Authority and the Counties entered into a Solid Waste Management Agreement, under which the Authority agreed to manage all solid waste within the Counties. Private haulers would remain free to pick up citizens' trash from the curb, but the Authority would take over the job of processing the trash, sorting it, and sending it off for disposal. To fulfill its part of the bargain, the Authority agreed to purchase and develop facilities for the processing and disposal of solid waste and recyclables generated in the Counties.

The Authority collected "tipping fees" to cover its operating and maintenance costs for these facilities.[1] The tipping fees significantly exceeded those charged for waste removal on the open market, but they allowed the Authority to do more than the average private waste disposer. In addition to landfill transportation and solid waste disposal, the fees enabled the Authority to provide recycling of 33 kinds of materials, as well as composting, household hazardous waste disposal, and a number of other services. If the Authority's operating costs and debt service were not recouped through tipping fees and other charges, the

---

[1] Tipping fees are disposal charges levied against collectors who drop off waste at a processing facility. They are called "tipping" fees because garbage trucks literally tip their back end to dump out the carried waste. As of 1995, haulers in the Counties had to pay tipping fees of at least $86 per ton, a price that ballooned to as much as $172 per ton if a particular load contained more than 25% recyclables.

agreement provided that the Counties would make up the difference.

As described, the agreement had a flaw: Citizens might opt to have their waste hauled to facilities with lower tipping fees. To avoid being stuck with the bill for facilities that citizens voted for but then chose not to use, the Counties enacted "flow control" ordinances requiring that all solid waste generated within the Counties be delivered to the Authority's processing sites.[2] Private haulers must obtain a permit from the Authority to collect waste in the Counties. Penalties for noncompliance with the ordinances include permit revocation, fines, and imprisonment.

Petitioners are United Haulers Association, Inc., a trade association made up of solid waste management companies, and six haulers that operated in Oneida and Herkimer Counties when this action was filed. In 1995, they sued the Counties and the Authority under Rev. Stat. §1979, 42 U. S. C. §1983, alleging that the flow control laws violate the Commerce Clause by discriminating against interstate commerce. They submitted evidence

---

[2] Oneida's flow control ordinance provides in part:

"From the time of placement of solid waste and of recyclables at the roadside or other designated area approved by the County or by the Authority pursuant to contract with the County, or by a person for collection in accordance herewith, such solid waste and recyclables shall be delivered to the appropriate facility, entity or person responsible for disposition designated by the County or by the Authority pursuant to contract with the Authority." App. to Pet. for Cert. 122a.

The relevant portion of Herkimer's flow control ordinance is substantially similar:

"After placement of garbage and of recyclable materials at the roadside or other designated area approved by the Legislature by a person for collection in accordance herewith, such garbage and recyclable material shall be delivered to the appropriate facility designated by the Legislature, or by the Authority pursuant to contract with the County." *Id.,* at 135a.

Opinion of the Court

that without the flow control laws and the associated $86-per-ton tipping fees, they could dispose of solid waste at out-of-state facilities for between $37 and $55 per ton, including transportation.

The District Court read our decision in *Carbone,* 511 U. S. 383, as categorically rejecting nearly all flow control laws. The court ruled in the haulers' favor, enjoining enforcement of the Counties' laws. The Second Circuit reversed, reasoning that *Carbone* and our other dormant Commerce Clause precedents allow for a distinction between laws that benefit public as opposed to private facilities. 261 F. 3d 245, 263 (2001). Accordingly, it held that a statute does not discriminate against interstate commerce when it favors local government at the expense of all private industry. The court remanded to let the District Court decide whether the Counties' ordinances nevertheless placed an incidental burden on interstate commerce, and if so, whether the ordinances' benefits outweighed that burden.

On remand and after protracted discovery, a Magistrate Judge and the District Court found that the haulers did not show that the ordinances imposed *any* cognizable burden on interstate commerce. The Second Circuit affirmed, assuming that the laws exacted some toll on interstate commerce, but finding any possible burden "modest" compared to the "clear and substantial" benefits of the ordinances. 438 F. 3d 150, 160 (2006). Because the Sixth Circuit had recently issued a conflicting decision holding that a flow control ordinance favoring a public entity *does* facially discriminate against interstate commerce, see *National Solid Wastes Management Assn.* v. *Daviess Cty.*, 434 F. 3d 898 (2006), we granted certiorari, 548 U. S. ___ (2006).

## II

### A

The Commerce Clause provides that "Congress shall have Power . . . [t]o regulate Commerce with foreign Nations, and among the several States." U. S. Const., Art. I, §8, cl. 3. Although the Constitution does not in terms limit the power of States to regulate commerce, we have long interpreted the Commerce Clause as an implicit restraint on state authority, even in the absence of a conflicting federal statute. See *Case of the State Freight Tax*, 15 Wall. 232, 279 (1873); *Cooley* v. *Board of Wardens of Port of Philadelphia ex rel. Soc. for Relief of Distressed Pilots*, 12 How. 299, 318 (1852).

To determine whether a law violates this so-called "dormant" aspect of the Commerce Clause, we first ask whether it discriminates on its face against interstate commerce. *American Trucking Assns., Inc.* v. *Michigan Pub. Serv. Comm'n*, 545 U. S. 429, 433 (2005); *Fort Gratiot Sanitary Landfill, Inc.* v. *Michigan Dept. of Natural Resources*, 504 U. S. 353, 359 (1992). In this context, "'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Systems, Inc.* v. *Department of Environmental Quality of Ore.*, 511 U. S. 93, 99 (1994); *New Energy Co. of Ind.* v. *Limbach*, 486 U. S. 269, 273 (1988). Discriminatory laws motivated by "simple economic protectionism" are subject to a "virtually *per se* rule of invalidity," *Philadelphia* v. *New Jersey*, 437 U. S. 617, 624 (1978), which can only be overcome by a showing that the State has no other means to advance a legitimate local purpose, *Maine* v. *Taylor*, 477 U. S. 131, 138 (1986).

### B

Following the lead of the Sixth Circuit in *Daviess County*, the haulers argue vigorously that the Counties'

ordinances discriminate against interstate commerce under *Carbone*. In *Carbone*, the town of Clarkstown, New York, hired a private contractor to build a waste transfer station. According to the terms of the deal, the contractor would operate the facility for five years, charging an above-market tipping fee of $81 per ton; after five years, the town would buy the facility for one dollar. The town guaranteed that the facility would receive a certain volume of trash per year. To make good on its promise, Clarkstown passed a flow control ordinance requiring that all nonhazardous solid waste within the town be deposited at the transfer facility. See 511 U. S., at 387.

This Court struck down the ordinance, holding that it discriminated against interstate commerce by "hoard[ing] solid waste, and the demand to get rid of it, for the benefit of the preferred processing facility." *Id.,* at 392. The dissent pointed out that all of this Court's local processing cases involved laws that discriminated in favor of *private* entities, not public ones. *Id.,* at 411 (opinion of SOUTER, J.). According to the dissent, Clarkstown's ostensibly private transfer station was "essentially a municipal facility," *id.,* at 419, and this distinction should have saved Clarkstown's ordinance because favoring local government is by its nature different from favoring a particular private company. The majority did not comment on the dissent's public-private distinction.

The parties in this case draw opposite inferences from the majority's silence. The haulers say it proves that the majority agreed with the dissent's characterization of the facility, but thought there was no difference under the dormant Commerce Clause between laws favoring private entities and those favoring public ones. The Counties disagree, arguing that the majority studiously avoided the issue because the facility in *Carbone* was private, and therefore the question whether *public* facilities may be

favored was not properly before the Court.[3]

We believe the latter interpretation of *Carbone* is correct. As the Second Circuit explained, "in *Carbone* the Justices were divided over the *fact of whether* the favored facility was public or private, rather than on the import of that distinction." 261 F. 3d, at 259 (emphasis in original). The *Carbone* dissent offered a number of reasons why public entities should be treated differently from private ones under the dormant Commerce Clause. See 511 U. S., at 419–422 (opinion of SOUTER, J.). It is hard to suppose that the *Carbone* majority definitively rejected these arguments without explaining why.

The *Carbone* majority viewed Clarkstown's flow control ordinance as "just one more instance of local processing requirements that we long have held invalid." *Id.,* at 391. It then cited six local processing cases, every one of which involved discrimination in favor of *private* enterprise.[4]

--------

[3] Each side makes much of the *Carbone* majority's various descriptions of the facility. The haulers point out that the Court twice referred to the construction and financing of the transfer station as the town's project. See 511 U. S., at 387 ("its new facility"), 394 ("its project"); Brief for Petitioners 20–22. The Counties note that the majority referred to the transfer station as a "town-sponsored facility," *Carbone*, 511 U. S., at 393, a "favored local operator," *id.,* at 389, "the preferred processing facility," a "single local proprietor," and a "local business," *id.,* at 392, but never as a *public* facility. Brief for Respondents 17, n. 7. The dissent has mined the *Carbone* decision, appendix, and briefs for further instances of allegedly supportive terminology, *post*, at 4–5 (opinion of ALITO, J.) but we continue to find this duel of labels at best inconclusive.

[4] See *South-Central Timber Development, Inc.* v. *Wunnicke*, 467 U. S. 82 (1984) (invalidating Alaska regulation requiring all Alaskan timber to be processed in-state prior to export); *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137 (1970) (invalidating application of an Arizona statute to require Arizona-grown cantaloupes to be packaged within the State before export); *Toomer* v. *Witsell*, 334 U. S. 385 (1948) (invalidating South Carolina statute requiring shrimp fisherman to unload, pack, and stamp their catch before shipping it to another State); *Foster-Fountain Packing Co.* v. *Haydel*, 278 U. S. 1 (1928) (invalidating a

The Court's own description of the cases acknowledges that the "offending local laws hoard a local resource—be it meat, shrimp, or milk—for the benefit of *local businesses* that treat it." *Id.,* at 392 (emphasis added). If the Court were extending this line of local processing cases to cover discrimination in favor of local government, one would expect it to have said so. Cf. *United States* v. *Burr*, 25 F. Cas. 55, 165 (No. 14,693) (CC Va. 1807) (Marshall, C. J.) ("[A]n opinion which is to . . . establish a principle never before recognized, should be expressed in plain and explicit terms").

The *Carbone* majority stated that "[t]he *only conceivable distinction*" between the laws in the local processing cases and Clarkstown's flow control ordinance was that Clarkstown's ordinance favored a single local business, rather than a group of them. 511 U. S*.,* at 392 (emphasis added). If the Court thought Clarkstown's processing facility was public, that additional distinction was not merely "conceivable"—it was conceived, and discussed at length, by three Justices in dissent. *Carbone* cannot be regarded as having decided the public-private question.[5]

––––––––––

Louisiana statute prohibiting the export of shrimp unless the heads and hulls had first been removed within the State); *Johnson* v. *Haydel*, 278 U. S. 16 (1928) (invalidating analogous Louisiana statute for oysters); *Minnesota* v. *Barber*, 136 U. S. 313 (1890) (invalidating Minnesota law requiring any meat sold within the State to be examined by an in-state inspector). *Dean Milk Co.* v. *Madison*, 340 U. S. 349 (1951) (invalidating local ordinance requiring all milk sold in the city to be pasteurized within five miles of the city center)—discussed elsewhere in *Carbone* and in the dissent here, *post*, at 12–13—is readily distinguishable on the same ground.

[5]The dissent asserts that the Court "long ago recognized that the Commerce Clause can be violated by a law that discriminates in favor of a state-owned monopoly." *Post*, at 6. The authority it cites—*Scott* v. *Donald*, 165 U. S. 58 (1897), and *Vance* v. *W. A. Vandercook Co.*, 170 U. S. 438, 442 (1898)—certainly qualifies as from "long ago," but does not support the proposition. *Scott* struck down two laws that discriminated in favor of in-state businesses and against out-of-state busi-

C

The flow control ordinances in this case benefit a clearly public facility, while treating all private companies exactly the same. Because the question is now squarely presented on the facts of the case before us, we decide that such flow control ordinances do not discriminate against interstate commerce for purposes of the dormant Commerce Clause.

Compelling reasons justify treating these laws differently from laws favoring particular private businesses over their competitors. "Conceptually, of course, any notion of discrimination assumes a comparison of substantially similar entities." *General Motors Corp.* v. *Tracy*, 519 U. S. 278, 298 (1997) (footnote omitted). But States and municipalities are not private businesses—far from it. Unlike private enterprise, government is vested with the responsibility of protecting the health, safety, and welfare of its citizens. See *Metropolitan Life Ins. Co.* v. *Massachusetts*, 471 U. S. 724, 756 (1985) ("The States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons" (internal quotation marks omit-

_____

nesses; neither law favored local government at the expense of all private industry. See 165 U. S., at 92–93, 101; *Granholm* v. *Heald*, 544 U. S. 460, 478–479 (2005) (describing *Scott* holding). *Scott* is simply another case like those cited in footnote 4.

*Vance* actually *upheld* "South Carolina's monopoly over liquor distribution[,] . . . reject[ing] the argument that this monopoly system was unconstitutionally discriminatory." *Granholm, supra,* at 507 (THOMAS, J., dissenting) (citing *Vance, supra,* at 450–452). It was the *dissent* in *Vance* that argued that "such a state monopoly system constituted unconstitutional discrimination." *Granholm, supra,* at 507 (THOMAS, J., dissenting) (citing 170 U. S., at 462–468 (opinion of Shiras, J.)). The *Vance* Court simply struck down a regulation on direct shipments to consumers for personal use, under the Court's excruciatingly arcane pre-Prohibition precedents. See 170 U. S., at 455. Most tellingly, *Vance* harkens back to a bygone era; until the dissent today, it had been cited by this Court in only two cases in the past 60 years.

ted)). These important responsibilities set state and local government apart from a typical private business. Cf. *Tracy*, *supra,* at 313 (SCALIA, J., concurring) ("Nothing in this Court's negative Commerce Clause jurisprudence" compels the conclusion "that private marketers engaged in the sale of natural gas are similarly situated to public utility companies").

Given these differences, it does not make sense to regard laws favoring local government and laws favoring private industry with equal skepticism. As our local processing cases demonstrate, when a law favors in-state business over out-of-state competition, rigorous scrutiny is appropriate because the law is often the product of "simple economic protectionism." *Wyoming* v. *Oklahoma*, 502 U. S. 437, 454 (1992); *Philadelphia* v. *New Jersey*, 437 U. S., at 626–627. Laws favoring local government, by contrast, may be directed toward any number of legitimate goals unrelated to protectionism. Here the flow control ordinances enable the Counties to pursue particular policies with respect to the handling and treatment of waste generated in the Counties, while allocating the costs of those policies on citizens and businesses according to the volume of waste they generate.

The contrary approach of treating public and private entities the same under the dormant Commerce Clause would lead to unprecedented and unbounded interference by the courts with state and local government. The dormant Commerce Clause is not a roving license for federal courts to decide what activities are appropriate for state and local government to undertake, and what activities must be the province of private market competition. In this case, the citizens of Oneida and Herkimer Counties have chosen the government to provide waste management services, with a limited role for the private sector in arranging for transport of waste from the curb to the public facilities. The citizens could have left the entire

matter for the private sector, in which case any regulation they undertook could not discriminate against interstate commerce. But it was also open to them to vest responsibility for the matter with their government, and to adopt flow control ordinances to support the government effort. It is not the office of the Commerce Clause to control the decision of the voters on whether government or the private sector should provide waste management services. "The Commerce Clause significantly limits the ability of States and localities to regulate or otherwise burden the flow of interstate commerce, but it does not elevate free trade above all other values." *Maine* v. *Taylor*, 477 U. S., at 151. See *Exxon Corp.* v. *Governor of Maryland*, 437 U. S. 117, 127 (1978) (Commerce Clause does not protect "the particular structure or method of operation" of a market).

We should be particularly hesitant to interfere with the Counties' efforts under the guise of the Commerce Clause because "[w]aste disposal is both typically and traditionally a local government function." 261 F. 3d, at 264 (case below) (Calabresi, J., concurring); see *USA Recycling, Inc.* v. *Town of Babylon*, 66 F. 3d 1272, 1275 (CA2 1995) ("For ninety years, it has been settled law that garbage collection and disposal is a core function of local government in the United States"); M. Melosi, Garbage in the Cities: Refuse, Reform, and the Environment, 1880–1980, pp. 153–155 (1981). Congress itself has recognized local government's vital role in waste management, making clear that "collection and disposal of solid wastes should continue to be primarily the function of State, regional, and local agencies." Resource Conservation and Recovery Act of 1976, 90 Stat. 2797, 42 U. S. C. §6901(a)(4). The policy of the State of New York favors "displac[ing] competition with regulation or monopoly control" in this area. N. Y. Pub. Auth. Law Ann. §2049–tt(3). We may or may not agree with that approach, but nothing in the Commerce

Clause vests the responsibility for that policy judgment with the Federal Judiciary.[6]

Finally, it bears mentioning that the most palpable harm imposed by the ordinances—more expensive trash removal—is likely to fall upon the very people who voted for the laws. Our dormant Commerce Clause cases often find discrimination when a State shifts the costs of regulation to other States, because when "the burden of state regulation falls on interests outside the state, it is unlikely to be alleviated by the operation of those political restraints normally exerted when interests within the state are affected." *Southern Pacific Co.* v. *Arizona ex rel. Sullivan*, 325 U. S. 761, 767–768, n. 2 (1945). Here, the citizens and businesses of the Counties bear the costs of the ordinances. There is no reason to step in and hand local businesses a victory they could not obtain through the political process.

We hold that the Counties' flow control ordinances, which treat in-state private business interests exactly the same as out-of-state ones, do not "discriminate against interstate commerce" for purposes of the dormant Commerce Clause.[7]

---

[6] JUSTICE THOMAS is thus wrong in stating that our approach might suggest "a policy-driven preference for government monopoly over privatization." *Post,* at 6 (opinion concurring in judgment). That is instead the preference of the affected locality here. Our opinion simply recognizes that a law favoring a public entity and treating all private entities the same does not discriminate against interstate commerce as does a law favoring local business over all others.

[7] The Counties and their *amicus* were asked at oral argument if affirmance would lead to the "Oneida-Herkimer Hamburger Stand," accompanied by a "flow control" law requiring citizens to purchase their burgers only from the state-owned producer. Tr. of Oral Arg. 33–34 (Counties), 45–46, 49–50 (*amicus* State of New York). We doubt it. "The existence of major in-state interests adversely affected by [a law] is a powerful safeguard against legislative abuse." *Minnesota* v. *Clover Leaf Creamery Co.*, 449 U. S. 456, 473, n. 17 (1981). Recognizing that local government may facilitate a customary and traditional govern-

D

The Counties' flow control ordinances are properly analyzed under the test set forth in *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137, 142 (1970), which is reserved for laws "directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." *Philadelphia* v. *New Jersey*, 437 U. S., at 624. Under the *Pike* test, we will uphold a nondiscriminatory statute like this one "unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." 397 U. S., at 142; *Northwest Central Pipeline Corp.* v. *State Corporation Comm'n of Kan.*, 489 U. S. 493, 525–526 (1989).

After years of discovery, both the Magistrate Judge and the District Court could not detect *any* disparate impact on out-of-state as opposed to in-state businesses. The Second Circuit alluded to, but did not endorse, a "rather abstract harm" that may exist because "the Counties' flow control ordinances have removed the waste generated in Oneida and Herkimer Counties from the national marketplace for waste processing services." 438 F. 3d, at 160. We find it unnecessary to decide whether the ordinances impose any incidental burden on interstate commerce because any arguable burden does not exceed the public benefits of the ordinances.

The ordinances give the Counties a convenient and effective way to finance their integrated package of waste-disposal services. While "revenue generation is not a local interest that can justify *discrimination* against interstate

_____

ment function such as waste disposal, without running afoul of the Commerce Clause, is hardly a prescription for state control of the economy. In any event, Congress retains authority under the Commerce Clause as written to regulate interstate commerce, whether engaged in by private or public entities. It can use this power, as it has in the past, to limit state use of exclusive franchises. See, *e.g., Gibbons* v. *Ogden*, 9 Wheat. 1, 221 (1824).

commerce," *Carbone*, 511 U. S., at 393 (emphasis added), we think it is a cognizable benefit for purposes of the *Pike* test.

At the same time, the ordinances are more than financing tools. They increase recycling in at least two ways, conferring significant health and environmental benefits upon the citizens of the Counties. First, they create enhanced incentives for recycling and proper disposal of other kinds of waste. Solid waste disposal is expensive in Oneida-Herkimer, but the Counties accept recyclables and many forms of hazardous waste for free, effectively encouraging their citizens to sort their own trash. Second, by requiring all waste to be deposited at Authority facilities, the Counties have markedly increased their ability to enforce recycling laws. If the haulers could take waste to any disposal site, achieving an equal level of enforcement would be much more costly, if not impossible. For these reasons, any arguable burden the ordinances impose on interstate commerce does not exceed their public benefits.

\*    \*    \*

The Counties' ordinances are exercises of the police power in an effort to address waste disposal, a typical and traditional concern of local government. The haulers nevertheless ask us to hold that laws favoring public entities while treating all private businesses the same are subject to an almost *per se* rule of invalidity, because of asserted discrimination. In the alternative, they maintain that the Counties' laws cannot survive the more permissive *Pike* test, because of asserted burdens on commerce. There is a common thread to these arguments: They are invitations to rigorously scrutinize economic legislation passed under the auspices of the police power. There was a time when this Court presumed to make such binding judgments for society, under the guise of interpreting the Due Process Clause. See *Lochner* v. *New York*, 198 U. S.

45 (1905). We should not seek to reclaim that ground for judicial supremacy under the banner of the dormant Commerce Clause.

The judgments of the United States Court of Appeals for the Second Circuit are affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———————

No. 05–1345

———————

## UNITED HAULERS ASSOCIATION, INC., ET AL., PETITIONERS *v.* ONEIDA-HERKIMER SOLID WASTE MANAGEMENT AUTHORITY ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[April 30, 2007]

JUSTICE SCALIA, concurring in part.

I join Part I and Parts II–A through II–C of the Court's opinion. I write separately to reaffirm my view that "the so-called 'negative' Commerce Clause is an unjustified judicial invention, not to be expanded beyond its existing domain." *General Motors Corp.* v. *Tracy*, 519 U. S. 278, 312 (1997) (SCALIA, J., concurring). "The historical record provides no grounds for reading the Commerce Clause to be other than what it says—an authorization for Congress to regulate commerce." *Tyler Pipe Industries, Inc.* v. *Washington State Dept. of Revenue*, 483 U. S. 232, 263 (1987) (SCALIA, J., concurring in part and dissenting in part).

I have been willing to enforce on *stare decisis* grounds a "negative" self-executing Commerce Clause in two situations: "(1) against a state law that facially discriminates against interstate commerce, and (2) against a state law that is indistinguishable from a type of law previously held unconstitutional by the Court." *West Lynn Creamery, Inc.* v. *Healy*, 512 U. S. 186, 210 (1994) (SCALIA, J., concurring in judgment). As today's opinion makes clear, the flow-control law at issue in this case meets neither condition. It benefits a *public entity* performing a traditional local-government function and treats *all private entities*

precisely the same way.  "Disparate treatment constitutes discrimination only if the objects of the disparate treatment are, for the relevant purposes, similarly situated." *Camps Newfound/Owatonna, Inc.* v. *Town of Harrison*, 520 U. S. 564, 601 (1997) (SCALIA, J., dissenting).  None of this Court's cases concludes that public entities and private entities are similarly situated for Commerce Clause purposes.  To hold that they are "would broaden the negative Commerce Clause beyond its existing scope, and intrude on a regulatory sphere traditionally occupied by . . . the States."  *Tracy*, *supra*, at 313 (SCALIA, J., concurring).

I am unable to join Part II–D of the principal opinion, in which the plurality performs so-called "*Pike* balancing." Generally speaking, the balancing of various values is left to Congress—which is precisely what the Commerce Clause (the *real* Commerce Clause) envisions.

# SUPREME COURT OF THE UNITED STATES

_____

No. 05–1345

_____

UNITED HAULERS ASSOCIATION, INC., ET AL.,
PETITIONERS *v.* ONEIDA-HERKIMER SOLID
WASTE MANAGEMENT AUTHORITY ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[April 30, 2007]

JUSTICE THOMAS, concurring in the judgment.

I concur in the judgment. Although I joined *C & A Carbone, Inc.* v. *Clarkstown*, 511 U. S. 383 (1994), I no longer believe it was correctly decided. The negative Commerce Clause has no basis in the Constitution and has proved unworkable in practice. See *Camps Newfound/Owatonna, Inc.* v. *Town of Harrison*, 520 U. S. 564, 610–620 (1997) (THOMAS, J., dissenting); *Tyler Pipe Industries, Inc.* v. *Washington State Dept. of Revenue*, 483 U. S. 232, 259–265 (1987) (SCALIA, J., concurring in part and dissenting in part); *License Cases*, 5 How. 504, 578–586 (1847) (Taney, C. J.). As the debate between the majority and dissent shows, application of the negative Commerce Clause turns solely on policy considerations, not on the Constitution. Because this Court has no policy role in regulating interstate commerce, I would discard the Court's negative Commerce Clause jurisprudence.

I

Under the Commerce Clause, "Congress shall have Power . . . [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U. S. Const., Art. I, §8, cl. 3. The language of the Clause allows Congress not only to regulate interstate

commerce but also to prevent state regulation of interstate commerce. *State Bd. of Ins.* v. *Todd Shipyards Corp.*, 370 U. S. 451, 456 (1962); *Gibbons* v. *Ogden*, 9 Wheat. 1, 210 (1824). Expanding on the interstate-commerce powers explicitly conferred on Congress, this Court has interpreted the Commerce Clause as a tool for courts to strike down state laws that it believes inhibit interstate commerce. But there is no basis in the Constitution for that interpretation.

The Court does not contest this point, and simply begins its analysis by appealing to *stare decisis:*

> "Although the Constitution does not in terms limit the power of States to regulate commerce, we have long interpreted the Commerce Clause as an implicit restraint on state authority, even in the absence of a conflicting federal statute. See *Case of the State Freight Tax*, 15 Wall. 232, 279 (1873); *Cooley* v. *Board of Wardens of Port of Philadelphia ex rel. Soc. for Relief of Distressed Pilots*, 12 How. 299, 318 (1852)." *Ante*, at 6.

The Court's reliance on *Cooley* and *State Freight Tax* is curious because the Court has abandoned the reasoning of those cases in its more recent jurisprudence. *Cooley* and *State Freight Tax* are premised upon the notion that the Commerce Clause is an exclusive grant of power to Congress over certain subject areas.[1] *Cooley*, *supra*, at 319–320 (holding that "[w]hatever subjects of this [Commerce Clause] power are in their nature national, or admit only of one uniform system, or plan of regulation, may justly be said to be of such a nature as to require exclusive legislation by [C]ongress" but holding that "the nature of th[e]

---

[1] This justification for the negative Commerce Clause is itself unsupported by the Constitution. See *Tyler Pipe Industries, Inc.* v. *Washington State Dept. of Revenue*, 483 U. S. 232, 261–262 (1987) (SCALIA, J., concurring in part and dissenting in part).

subject [of state pilotage laws] is not such as to require its exclusive legislation" and therefore upholding the state laws against the negative Commerce Clause challenge); *State Freight Tax*, *supra*, at 279–280 (applying the same rationale). The Court, however, no longer limits Congress' power by analyzing whether the subjects of state regulation "admit only of one uniform system," *Cooley*, *supra*, at 319. Rather, the modern jurisprudence focuses upon the way in which States regulate those subjects to decide whether the regulation is permissible. *E.g.*, *ante*, at 6, 13. Because the reasoning of *Cooley* and *State Freight Tax* has been rejected entirely, they provide no foundation for today's decision.

Unfazed, the Court proceeds to analyze whether the ordinances "discriminat[e] on [their] face against interstate commerce." *Ante*, at 6. Again, none of the cases the Court cites explains how the absence or presence of discrimination is relevant to deciding whether the ordinances are constitutionally permissible, and at least one case affirmatively admits that the nondiscrimination rule has no basis in the Constitution. *Philadelphia* v. *New Jersey*, 437 U. S. 617, 623 (1978) ("The bounds of these restraints appear nowhere in the words of the Commerce Clause, but have emerged gradually in the decisions of this Court giving effect to its basic purpose"). Thus cloaked in the "purpose" of the Commerce Clause, the rule against discrimination that the Court applies to decide this case exists untethered from the written Constitution. The rule instead depends upon the policy preferences of a majority of this Court.

The Court's policy preferences are an unsuitable basis for constitutional doctrine because they shift over time, as demonstrated by the different theories the Court has offered to support the nondiscrimination principle. In the early years of the nondiscrimination rule, the Court struck down a state health law because "the enactment of a

similar statute by each one of the States composing the
Union would result in the destruction of commerce among
the several States." *Minnesota* v. *Barber*, 136 U. S. 313,
321 (1890); see *Foster-Fountain Packing Co.* v. *Haydel*,
278 U. S. 1, 13 (1928) (stating that a Commerce Clause
violation would occur if the state statute would "directly
. . . obstruct and burden interstate commerce").    More
recently, the Court has struck down state laws sometimes
based on its preference for national unity, see, *e.g.*, *Ameri-
can Trucking Assns., Inc.* v. *Michigan Pub. Serv. Comm'n*,
545 U. S. 429, 433 (2005) (justifying the nondiscrimination
rule by stating that "[o]ur Constitution was framed upon
the theory that the peoples of the several states must sink
or swim together" (internal quotation marks omitted)),
and other times on the basis of antiprotectionist senti-
ment, see, *e.g.*, *Oregon Waste Systems, Inc.* v. *Department
of Environmental Quality of Ore.*, 511 U. S. 93, 98 (1994)
(noting the interest in "avoid[ing] the tendencies toward
economic Balkanization"); *New Energy Co. of Ind.* v. *Lim-
bach*, 486 U. S. 269, 273 (1988) (stating that the negative
Commerce Clause "prohibits economic protectionism—that
is, regulatory measures designed to benefit in-state eco-
nomic interests by burdening out-of-state competitors");
see also *Carbone*, 511 U. S., at 390 ("The central rationale
for the rule against discrimination is to prohibit state or
municipal laws whose object is local economic protection-
ism, laws that would excite those jealousies and retalia-
tory measures the Constitution was designed to prevent");
*Toomer* v. *Witsell*, 334 U. S. 385, 403–404 (1948) (striking
down a law that "impose[d] an artificial rigidity on the
economic pattern of the industry").

Many of the above-cited cases (and today's majority and
dissent) rest on the erroneous assumption that the Court
must choose between economic protectionism and the free
market.    But the Constitution vests that fundamentally
legislative choice in Congress.    To the extent that Con-

gress does not exercise its authority to make that choice, the Constitution does not limit the States' power to regulate commerce. In the face of congressional silence, the States are free to set the balance between protectionism and the free market. Instead of accepting this constitutional reality, the Court's negative Commerce Clause jurisprudence gives nine Justices of this Court the power to decide the appropriate balance.

## II

As the foregoing demonstrates, despite more than 100 years of negative Commerce Clause doctrine, there is no principled way to decide this case under current law. Notably, the Court cannot and does not consider this case "[i]n light of the language of the Constitution and the historical context." *Alden* v. *Maine*, 527 U. S. 706, 743 (1999). Likewise, it cannot follow "the cardinal rule to construe provisions in context." *United States* v. *Balsys*, 524 U. S. 666, 673 (1998). And with no text to construe, the Court cannot take into account the Founders' "deliberate choice of words" or "their natural meaning." *Wright* v. *United States*, 302 U. S. 583, 588 (1938). Furthermore, as the debate between the Court's opinion and the dissenting opinion reveals, no case law applies to the facts of this case.[2]

Explaining why the ordinances do not discriminate against interstate commerce, the Court states that "government is vested with the responsibility of protecting the health, safety, and welfare of its citizens." *Ante*, at 10. According to the Court, a law favoring in-state business requires rigorous scrutiny because the law "is often the product of 'simple economic protectionism.'" *Ante,* at 11.

---

[2] No previous case addresses the question whether the negative Commerce Clause applies to favoritism of a government entity. I agree with the Court that *C & A Carbone, Inc.* v. *Clarkstown,* 511 U. S. 383 (1994), did not resolve this issue. *Ante*, at 6–9.

A law favoring local government, however, "may be directed toward any number of legitimate goals unrelated to protectionism." *Ibid.* This distinction is razor thin: In contrast to today's deferential approach (apparently based on the Court's trust of local government), the Court has applied the equivalent of strict scrutiny in other cases even where it is unchallenged that the state law discriminated in favor of in-state private entities for a legitimate, nonprotectionist reason. See *Barber*, *supra,* at 319 (striking down the State's inspection law for livestock even though it did not challenge "[t]he presumption that this statute was enacted, in good faith, . . . to protect the health of the people of Minnesota").

In *Carbone*, which involved discrimination in favor of private entities, we did not doubt the good faith of the municipality in attempting to deal with waste through a flow-control ordinance. 511 U. S., at 386–389. But we struck down the ordinance because it did not allow interstate entities to participate in waste disposal. *Id.*, at 390–395. The majority distinguishes *Carbone* by deciding that favoritism of a government monopoly is less suspect than government regulation of private entities.[3] I see no basis for drawing such a conclusion, which, if anything, suggests a policy-driven preference for government monopoly over privatization. *Ante*, at 12 (stating that "waste disposal is both typically and traditionally a local government function" (alteration and internal quotation marks omitted)). Whatever the reason, the choice is not the Court's to make. Like all of the Court's previous negative Commerce Clause cases, today's decision leaves the future of state and local regulation of commerce to the whim of the Fed-

——————

[3] The dissent argues that such a preference is unwarranted. *Post*, at 11 (opinion of Alito, J.) ("I cannot accept the proposition that laws discriminating in favor of state-owned enterprises are so unlikely to be the product of economic protectionism that they should be exempt from the usual dormant Commerce Clause standards").

eral Judiciary.

### III

Despite its acceptance of negative Commerce Clause jurisprudence, the Court expresses concern about "unprecedented and unbounded interference by the courts with state and local government." *Ante*, at 11. It explains:

> "The dormant Commerce Clause is not a roving license for federal courts to decide what activities are appropriate for state and local government to undertake, and what activities must be the province of private market competition.
>
> .      .      .      .      .
>
> "There is no reason to step in and hand local businesses a victory they could not obtain through the political process." *Ante,* at 11, 13.

I agree that the Commerce Clause is not a "roving license" and that the Court should not deliver to businesses victories that they failed to obtain through the political process. I differ with the Court because I believe its powerful rhetoric is completely undermined by the doctrine it applies.

In this regard, the Court's analogy to *Lochner* v. *New York,* 198 U. S. 45 (1905), suggests that the Court should reject the negative Commerce Clause, rather than tweak it. *Ante*, at 15. In *Lochner* the Court located a "right of free contract" in a constitutional provision that says nothing of the sort. 198 U. S., at 57. The Court's negative Commerce Clause jurisprudence, created from whole cloth, is just as illegitimate as the "right" it vindicated in *Lochner*. Yet today's decision does not repudiate that doctrinal error. Rather, it further propagates the error by narrowing the negative Commerce Clause for policy reasons—reasons that later majorities of this Court may find to be entirely illegitimate.

In so doing, the majority revisits familiar territory: Just three years after *Lochner*, the Court narrowed the right of contract for policy reasons but did not overrule *Lochner*. *Muller* v. *Oregon*, 208 U. S. 412, 422–423 (1908) (upholding a maximum-hours requirement for women because the difference between the "two sexes" "justifies a difference in legislation").    Like the *Muller* Court, today's majority trifles with an unsound and illegitimate jurisprudence yet fails to abandon it.

Because I believe that the power to regulate interstate commerce is a power given to Congress and not the Court, I concur in the judgment of the Court.

# SUPREME COURT OF THE UNITED STATES

————

No. 05–1345

————

## UNITED HAULERS ASSOCIATION, INC., ET AL., PETITIONERS *v.* ONEIDA-HERKIMER SOLID WASTE MANAGEMENT AUTHORITY ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[April 30, 2007]

JUSTICE ALITO, with whom JUSTICE STEVENS and JUSTICE KENNEDY join, dissenting.

In *C & A Carbone, Inc.* v. *Clarkstown*, 511 U. S. 383 (1994), we held that "a so-called flow control ordinance, which require[d] all solid waste to be processed at a designated transfer station before leaving the municipality," discriminated against interstate commerce and was invalid under the Commerce Clause because it "depriv[ed] competitors, including out-of-state firms, of access to a local market." *Id.,* at 386. Because the provisions challenged in this case are essentially identical to the ordinance invalidated in *Carbone*, I respectfully dissent.

## I

This Court has "interpreted the Commerce Clause to invalidate local laws that impose commercial barriers or discriminate against an article of commerce by reason of its origin or destination out of State." *Id.,* at 390. As the Court acknowledges, a law "'"discriminat[es]"'" in this context if it mandates "'differential treatment of in-state and out-of-state economic interests'" in a way "'that benefits the former and burdens the latter.'" *Ante*, at 6 (quoting *Oregon Waste Systems, Inc.* v. *Department of Environmental Quality of Ore.*, 511 U. S. 93, 99 (1994)). A local

law that discriminates against interstate commerce is sustainable only if it serves a legitimate local purpose that could not be served as well by nondiscriminatory means. *Maine* v. *Taylor*, 477 U. S. 131 (1986).

"Solid waste, even if it has no value, is an article of commerce." *Fort Gratiot Sanitary Landfill, Inc.* v. *Michigan Dept. of Natural Resources*, 504 U. S. 353, 359 (1992). Accordingly, laws that "discriminate against [trash] by reason of its origin or destination out of State," *Carbone*, 511 U. S., at 390, are sustainable only if they serve a legitimate local purpose that could not be served as well by nondiscriminatory means.

In *Carbone,* this Court invalidated a local ordinance requiring all nonhazardous solid waste in Clarkstown, New York, to be deposited at a specific local transfer facility. The Court concluded that the ordinance discriminated against interstate commerce because it "hoard[ed] solid waste, and the demand to get rid of it, for the benefit of the preferred processing facility." *Id.,* at 392.

The Court explained that the flow-control ordinance did serve a purpose that a nonprotectionist regulation would not: "It ensures that the town-sponsored facility will be profitable, so that the local contractor can build it and Clarkstown can buy it back at nominal cost in five years." *Id.,* at 393. "In other words . . . the flow control ordinance is a financing measure." *Ibid.* The Court concluded, however, that "revenue generation is not a local interest that can justify discrimination against interstate commerce." *Ibid.*

The Court also held that "Clarkstown has any number of nondiscriminatory alternatives for addressing the health and environmental problems alleged to justify the ordinance"—including "uniform safety regulations" that could be enacted to "ensure that competitors . . . do not underprice the market by cutting corners on environmental safety." *Ibid.* Thus, the Court invalidated the

ordinance because any legitimate local interests served by the ordinance could be accomplished through nondiscriminatory means. See *id.*, at 392–393.

This case cannot be meaningfully distinguished from *Carbone*. As the Court itself acknowledges, "[t]he only salient difference" between the cases is that the ordinance invalidated in *Carbone* discriminated in favor of a privately owned facility, whereas the laws at issue here discriminate in favor of "facilities owned and operated by a state-created public benefit corporation." *Ante*, at 1. The Court relies on the distinction between public and private ownership to uphold the flow-control laws, even though a straightforward application of *Carbone* would lead to the opposite result. See *ante,* at 10–12. The public-private distinction drawn by the Court is both illusory and without precedent.

## II

The fact that the flow control laws at issue discriminate in favor of a government-owned enterprise does not meaningfully distinguish this case from *Carbone*. The preferred facility in *Carbone* was, to be sure, nominally owned by a private contractor who had built the facility on the town's behalf, but it would be misleading to describe the facility as private. In exchange for the contractor's promise to build the facility for the town free of charge and then to sell it to the town five years later for $1, the town guaranteed that, during the first five years of the facility's existence, the contractor would receive "a minimum waste flow of 120,000 tons per year" and that the contractor could charge an above-market tipping fee. 511 U. S., at 387. If the facility "received less than 120,000 tons in a year, the town [would] make up the tipping fee deficit." *Ibid.* To prevent residents, businesses, and trash haulers from taking their waste elsewhere in pursuit of lower tipping fees (leaving the town responsible for covering any

shortfall in the contractor's guaranteed revenue stream),
the town enacted an ordinance "requir[ing] all nonhazard-
ous solid waste within the town to be deposited at" the
preferred facility. *Ibid.*

This Court observed that "[t]he object of this arrange-
ment was to amortize the cost of the transfer station: The
town would finance *its new facility* with the income gener-
ated by the tipping fees." *Ibid.* (emphasis added). "In
other words," the Court explained, "the flow control ordi-
nance [wa]s a financing measure," *id.*, at 393, for what
everyone—including the Court—regarded as *the town's*
new transfer station.

The only real difference between the facility at issue in
*Carbone* and its counterpart in this case is that title to the
former had not yet formally passed to the municipality.
The Court exalts form over substance in adopting a test
that turns on this technical distinction, particularly since,
barring any obstacle presented by state law, the transac-
tion in *Carbone* could have been restructured to provide
for the passage of title at the beginning, rather than the
end, of the 5-year period.

For this very reason, it is not surprising that in *Carbone*
the Court did not dispute the dissent's observation that
the preferred facility was for all practical purposes owned
by the municipality. See *id.,* at 419 (opinion of
SOUTER, J.) ("Clarkstown's transfer station is essentially a
municipal facility"); *id.*, at 416 (describing the nominal
"proprietor" of the transfer station as "essentially an agent
of the municipal government"). To the contrary, the Court
repeatedly referred to the transfer station in terms sug-
gesting that the transfer station did in fact belong to the
town. See *id.,* at 387 (explaining that "[t]he town would
finance *its* new facility with the income generated by the
tipping fees" (emphasis added)); *id.*, at 393 (observing that
the challenged flow-control ordinance was designed to
"ensur[e] that the town-sponsored facility will be profit-

able"); *id.*, at 394 (concluding that, "having elected to use the open market to earn revenues for *its* project, the town may not employ discriminatory regulation to give that project an advantage over rival businesses from out of State" (emphasis added)).

Today the Court dismisses those statements as "at best inconclusive." *Ante*, at 8, n. 3. The Court, however, fails to offer any explanation as to what other meaning could possibly attach to *Carbone*'s repeated references to Clarkstown's transfer station as a municipal facility. It also ignores the fact that the ordinance itself, which was included in its entirety in an appendix to the Court's opinion, repeatedly referred to the station as "the Town of Clarkstown solid waste facility." 511 U. S., at 396, 398, 399. The Court likewise fails to acknowledge that the parties in *Carbone* openly acknowledged the municipal character of the transfer station. See Pet. for Cert., O. T. 1993, No. 92–1402, p. 5 ("*The town's* designated trash disposal facility is operated by a private contractor, under an agreement with the town" (emphasis added)); Brief for Petitioner, O. T. 1993, No. 92–1402, p. 26 (arguing that "it is clear that the purported safety and health benefits of [the flow control ordinance] derive simply from the continued economic viability of *the town's* waste facility" (emphasis added; internal quotation marks omitted)); Brief for Respondent, O. T. 1993, No. 92–1402, p. 8 ("The Town entered into a contract with Clarkstown Recycling, Inc., which provided for that firm to build and operate the new *Town facility*" (emphasis added)).

I see no ambiguities in those statements, much less any reason to dismiss them as "at best inconclusive"; they reflect a clear understanding that the station was, for all purposes relevant to the dormant Commerce Clause, a municipal facility.

### III

In any event, we have never treated discriminatory legislation with greater deference simply because the entity favored by that legislation was a government-owned enterprise. In suggesting otherwise, the Court relies unduly on *Carbone*'s passing observation that "'offending local laws hoard a local resource—be it meat, shrimp, or milk—for the benefit of *local businesses*.'" *Ante*, at 9 (emphasis in original). *Carbone*'s use of the word "businesses," the Court insists, somehow reveals that *Carbone* was not "extending" our dormant Commerce Clause jurisprudence "to cover discrimination in favor of local government." *Ibid.*

But no "exten[sion]" was required. The Court has long subjected discriminatory legislation to strict scrutiny, and has never, until today, recognized an exception for discrimination in favor of a state-owned entity.

### A

This Court long ago recognized that the Commerce Clause can be violated by a law that discriminates in favor of a state-owned monopoly. In the 1890's, South Carolina enacted laws giving a state agency the exclusive right to operate facilities selling alcoholic beverages within that State, and these laws were challenged under the Commerce Clause in *Scott* v. *Donald*, 165 U. S. 58 (1897), and *Vance* v. *W. A. Vandercook Co.*, 170 U. S. 438 (1898). The Court held that the Commerce Clause barred the State from prohibiting its residents from purchasing alcohol from out-of-state vendors, see *id.*, at 442, but that the State could surmount this problem by allowing residents to receive out-of-state shipments for their personal use. See *id.*, at 452. The Court's holding was based on the same fundamental dormant Commerce Clause principle

applied in *Carbone*.[1]  As the Court put it in *Vance*, a State "'cannot discriminate against the bringing of [lawful] articles in and importing them from other States'" because such discrimination is "'a hindrance to interstate commerce and an unjust preference of the products of the enacting State as against similar products of other States.'"  170 U. S., at 443 (quoting *Scott*, *supra*, at 101). Cf., *Carbone*, *supra*, at 390 (the Commerce Clause bars state and local laws that "impose commercial barriers or discriminate against an article of commerce by reason of its origin or destination out of State").

Thus, were it not for the Twenty-first Amendment, laws creating state-owned liquor monopolies—which many States maintain today—would be deemed discriminatory under the dormant Commerce Clause.  See *Granholm* v. *Heald*, 544 U. S. 460, 489 (2005) (explaining that the Twenty-first Amendment makes it possible for States to "assume direct control of liquor distribution through state-run outlets"); see *id.,* at 517–518 (THOMAS, J., dissenting) (noting that, although laws creating a "state monopoly" in the sale of liquor "discriminat[e]" against interstate commerce, they are "within the ambit of the Twenty-first Amendment" and are therefore immune from scrutiny under the dormant Commerce Clause).  There is, of course, no comparable provision in the Constitution authorizing States to discriminate against out-of-state providers of waste processing and disposal services, either by means of a government-owned monopoly or otherwise.

------

[1] See *Granholm* v. *Heald*, 544 U. S. 460, 517–518 (2005) (THOMAS, J., dissenting) ("These liquor regulation schemes discriminated against out-of-state economic interests . . . .  State monopolies that did not permit direct shipments to consumers, for example, were thought to discriminate against out-of-state wholesalers and retailers . . ." (citing *Vance,* 170 U. S., at 451–452)).

B

Nor has this Court ever suggested that discriminatory legislation favoring a state-owned enterprise is entitled to favorable treatment. To be sure, state-owned entities are accorded special status under the market-participant doctrine. But that doctrine is not applicable here.

Under the market-participant doctrine, a State is permitted to exercise "'independent discretion as to parties with whom [it] will deal.'" *Reeves, Inc.* v. *Stake*, 447 U. S. 429, 438–439 (1980). The doctrine thus allows States to engage in certain otherwise-discriminatory practices (*e.g.*, selling exclusively to, or buying exclusively from, the State's own residents), so long as the State is "acting as a market participant, *rather than as a market regulator*," *South-Central Timber Development, Inc.* v. *Wunnicke*, 467 U. S. 82, 93 (1984) (emphasis added).

Respondents are doing exactly what the market-participant doctrine says they cannot: While acting as market participants by operating a fee-for-service business enterprise in an area in which there is an established interstate market, respondents are also regulating that market in a discriminatory manner and claiming that their special governmental status somehow insulates them from a dormant Commerce Clause challenge. See *ibid.*

Respondents insist that the market-participant doctrine has no application here because they are not asserting a defense under the market-participant doctrine, Brief for Respondents 24–25, but that argument misses the point. Regardless of whether respondents can assert a defense under the market-participant doctrine, this Court's cases make clear that States cannot discriminate against interstate commerce unless they are acting solely as market participants. Today, however, the Court suggests, contrary to its prior holdings, that States can discriminate in favor of in-state interests while acting both as a market participant *and* as a market regulator.

ALITO, J., dissenting

IV

Despite precedent condemning discrimination in favor of government-owned enterprises, the Court attempts to develop a logical justification for the rule it creates today. That justification rests on three principal assertions. First, the Court insists that it simply "does not make sense to regard laws favoring local government and laws favoring private industry with equal skepticism," because the latter are "often the product of 'simple economic protectionism,'" *ante*, at 10–11 (quoting *Wyoming* v. *Oklahoma*, 502 U. S. 437, 454 (1992)), while the former "may be directed toward any number of legitimate goals unrelated to protectionism," *ante,* at 11. Second, the Court reasons that deference to legislation discriminating in favor of a municipal landfill is especially appropriate considering that "'[w]aste disposal is both typically and traditionally a local government function.'" *Ante*, at 12 (quoting 261 F. 3d 245, 264 (CA2 2001) (Calabresi, J., concurring)). Third, the Court suggests that respondents' flow-control laws are not discriminatory because they "treat in-state private business interests exactly the same as out-of-state ones." *Ante*, at 13. I find each of these arguments unpersuasive.

A

I see no basis for the Court's assumption that discrimination in favor of an in-state facility owned by the government is likely to serve "legitimate goals unrelated to protectionism." Discrimination in favor of an in-state government facility serves "'local economic interests,'" *Carbone*, 511 U. S., at 404 (O'Connor, J., concurring in judgment) (quoting *Raymond Motor Transp., Inc.* v. *Rice*, 434 U. S. 429, 444, n. 18 (1978)), inuring to the benefit of local residents who are employed at the facility, local businesses that supply the facility with goods and services, and local workers employed by such businesses. It

is therefore surprising to read in the opinion of the Court that state discrimination in favor of a state-owned business is not likely to be motivated by economic protectionism.

Experience in other countries, where state ownership is more common than it is in this country, teaches that governments often discriminate in favor of state-owned businesses (by shielding them from international competition) precisely for the purpose of protecting those who derive economic benefits from those businesses, including their employees.[2]   Such discrimination amounts to economic protectionism in any realistic sense of the term.[3]

By the same token, discrimination in favor of an in-state, privately owned facility may serve legitimate ends, such as the promotion of public health and safety.  For example, a State might enact legislation discriminating in favor of produce or livestock grown within the State, reasoning that the State's inspectors can more easily monitor the use of pesticides, fertilizers, and feed on farms within the State's borders.  Such legislation would almost certainly be unconstitutional, notwithstanding its potential to promote public health and safety.  See *Philadelphia* v.

---

[2] See, *e.g.*, Owen, Sun, & Zheng, Antitrust in China: The Problem of Incentive Compatibility, 1 J. of Competition L. & Econ. 123, 131–133 (2005); Qin, WTO Regulation of Subsidies to State-owned Enterprises (SOEs)—A Critical Appraisal of the China Accession Protocol, 7 J. of Int'l Econ. L. 863, 869–876 (Dec. 2004).

[3] It therefore seems strange that the Commerce Clause, which has historically been understood to protect free trade and prohibit States from "plac[ing] [themselves] in a position of economic isolation," *Baldwin* v. *G. A. F. Seelig, Inc.*, 294 U. S. 511, 527 (1935), is now being construed to condone blatantly protectionist laws on grounds that such legislation is necessary to support governmental efforts to commandeer the local market for a particular good or service.  In adopting that construction, the Court sends a bold and enticing message to local governments throughout the United States: Protectionist legislation is now permissible, so long as the enacting government excludes all private-sector participants from the affected local market.

*New Jersey*, 437 U. S. 617, 627 (1978) (noting that the Court has repeatedly invalidated legislation where "a presumably legitimate goal was sought to be achieved by the illegitimate means of isolating the State from the national economy").

The fallacy in the Court's approach can be illustrated by comparing a law that discriminates in favor of an in-state facility, owned by a corporation whose shares are publicly held, and a law discriminating in favor of an otherwise identical facility that is owned by the State or municipality. Those who are favored and disfavored by these two laws are essentially the same with one major exception: The law favoring the corporate facility presumably benefits the corporation's shareholders, most of whom are probably not local residents, whereas the law favoring the government-owned facility presumably benefits the people of the enacting State or municipality. I cannot understand why only the former law, and not the latter, should be regarded as a tool of economic protectionism. Nor do I think it is realistic or consistent with our precedents to condemn some discriminatory laws as protectionist while upholding other, equally discriminatory laws as lawful measures designed to serve legitimate local interests unrelated to protectionism.

For these reasons, I cannot accept the proposition that laws discriminating in favor of state-owned enterprises are so unlikely to be the product of economic protectionism that they should be exempt from the usual dormant Commerce Clause standards.

Proper analysis under the dormant Commerce Clause involves more than an inquiry into whether the challenged Act is in some sense "directed toward . . . legitimate goals unrelated to protectionism"; equally important are the means by which those goals are realized. If the chosen means take the form of a statute that discriminates against interstate commerce—"'either on its face or in

practical effect'"—then "the burden falls on [the enacting government] to demonstrate both that the statute 'serves a legitimate local purpose,' and that this purpose could not be served as well by available nondiscriminatory means." *Taylor*, 477 U. S., at 138 (quoting *Hughes* v. *Oklahoma*, 441 U. S. 322, 336 (1979)).

Thus, if the legislative *means* are themselves discriminatory, then regardless of how legitimate and nonprotectionist the underlying legislative *goals* may be, the legislation is subject to strict scrutiny. Similarly, the fact that a discriminatory law "may [in some sense] be directed toward any number of legitimate goals unrelated to protectionism" does not make the law nondiscriminatory. The existence of such goals is relevant, not to whether the law is discriminatory, but to whether the law can be allowed to stand even though it discriminates against interstate commerce. And even then, the existence of legitimate goals is not enough; discriminatory legislation can be upheld only where such goals cannot adequately be achieved through nondiscriminatory means. See, *e.g.*, *Philadelphia, supra*, at 626–627 ("[T]he evil of protectionism can reside in legislative means as well as legislative ends," such that "whatever [the State's] purpose, it may not be accomplished by discriminating against articles of commerce coming from outside the State unless there is some reason, apart from their origin, to treat them differently"); *Hunt* v. *Washington State Apple Advertising Comm'n*, 432 U. S. 333, 352–353 (1977) (explaining that "we need not ascribe an economic protection motive to" discriminatory laws; such laws are subject to strict scrutiny even "if enacted for the declared purpose of protecting consumers from deception and fraud in the marketplace").

*Dean Milk Co.* v. *Madison*, 340 U. S. 349 (1951), is instructive on this point. That case involved a dormant Commerce Clause challenge to an ordinance requiring all milk sold in Madison, Wisconsin, to be processed within

five miles of the city's central square. See *id.*, at 350. The ordinance "professe[d] to be a health measure," *id.*, at 354, and may have conferred some benefit on the city and its residents to the extent that it succeeded in guaranteeing the purity and quality of the milk sold in the city. The Court nevertheless invalidated the ordinance, concluding that any public health benefits it may have conferred could be achieved through "reasonable nondiscriminatory alternatives," including a system that would allow a nonlocal dairy to qualify to sell milk in the city upon proving that it was in compliance with applicable health and safety requirements. *Id.*, at 354–356.

The Court did not inquire whether the real purpose of the ordinance was to benefit public health and safety or to protect local economic interests; nor did the Court make any effort to determine whether or to what extent the ordinance may have succeeded in promoting health and safety. In fact, the Court apparently assumed that the ordinance could fairly be characterized as "a health measure." *Id.*, at 354. The Court nevertheless concluded that the ordinance could not stand because it "erect[ed] an economic barrier protecting a major local industry against competition from without the State," "plac[ed] a discriminatory burden on interstate commerce," and was "not essential for the protection of local health interests." *Id.*, at 354, 356.

The overarching concern expressed by the Court was that the ordinance, if left intact, "would invite a multiplication of preferential trade areas destructive of the very purpose of the Commerce Clause." *Id.,* at 356. "Under the circumstances here presented," the Court concluded, "the regulation must yield to the principle that 'one state in its dealings with another may not place itself in a position of economic isolation.'" *Ibid.* (quoting *Baldwin* v. *G. A. F. Seelig, Inc.*, 294 U. S. 511, 527 (1935)).

The same reasoning dooms the laws challenged here.

Like the ordinance in *Dean Milk*, these laws discriminate against interstate commerce (generally favoring local interests over nonlocal interests), but are defended on the ground that they serve legitimate goals unrelated to protectionism (*e.g.*, health, safety, and protection of the environment). And while I do not question that the laws at issue in this case serve legitimate goals, the laws offend the dormant Commerce Clause because those goals could be attained effectively through nondiscriminatory means. Indeed, no less than in *Carbone*, those goals could be achieved through "uniform [health and] safety regulations enacted without the object to discriminate" that "would ensure that competitors [to the municipal program] do not underprice the market by cutting corners on environmental safety." 511 U. S., at 393. Respondents would also be free, of course, to "subsidize the[ir] [program] through general taxes or municipal bonds." *Id.*, at 394. "But having elected to use the open market to earn revenues for" their waste management program, respondents "may not employ discriminatory regulation to give that [program] an advantage over rival businesses from out of State." *Ibid.*

B

The Court next suggests that deference to legislation discriminating in favor of a municipal landfill is especially appropriate considering that "'[w]aste disposal is both typically and traditionally a local government function.'" *Ante*, at 12 (quoting 261 F. 3d, at 264 (Calabresi, J., concurring)). I disagree on two grounds.

First, this Court has previously recognized that any standard "that turns on a judicial appraisal of whether a particular governmental function is 'integral' or 'traditional'" is "'unsound in principle and unworkable in practice.'" *Garcia* v. *San Antonio Metropolitan Transit Authority*, 469 U. S. 528, 546–547 (1985). Indeed, the Court

has *twice* experimented with such standards—first in the context of intergovernmental tax immunity, see *South Carolina* v. *United States*, 199 U. S. 437 (1905), and more recently in the context of state regulatory immunity under the Commerce Clause, see *National League of Cities* v. *Usery*, 426 U. S. 833 (1976)—only to abandon them later as analytically unsound. See *Garcia, supra*, at 547 (overruling *National League of Cities*); *New York* v. *United States*, 326 U. S. 572 (1946) (overruling *South Carolina* v. *United States*). Thus, to the extent today's holding rests on a distinction between "traditional" governmental functions and their nontraditional counterparts, see *ante*, at 11, it cannot be reconciled with prior precedent.

Second, although many municipalities in this country have long assumed responsibility for disposing of local garbage, see *Carbone, supra*, at 419–420, and n. 10 (SOUTER, J., dissenting), most of the garbage produced in this country is still managed by the private sector. See Brief for National Solid Wastes Management Association et al. as *Amici Curiae* 22 ("Today, nearly two-thirds of solid waste received at landfills is received at private sector landfills"); R. W. Beck, Inc. et al., Size of the United States Solid Waste Industry, p. ES–3 (Apr. 2001) (study sponsored by the Environmental Research and Education Foundation) (noting that in 1999, 69.2% of the solid waste produced in the United States was managed by privately owned businesses). In that respect, the Court is simply mistaken in concluding that waste disposal is "typically" a local government function.

Moreover, especially considering the Court's recognition that "'any notion of discrimination assumes a comparison of substantially similar entities,'" *ante*, at 10 (quoting *General Motors Corp.* v. *Tracy*, 519 U. S. 278, 298 (1997)), a "traditional" municipal landfill is for present purposes entirely different from a monopolistic landfill supported by the kind of discriminatory legislation at issue in this case

and in *Carbone*. While the former may be rooted in history and tradition, the latter has been deemed unconstitutional until today. See *Carbone, supra*, at 392–393. It is therefore far from clear that the laws at issue here can fairly be described as serving a function "typically and traditionally" performed by local governments.

C

Equally unpersuasive is the Court's suggestion that the flow-control laws do not discriminate against interstate commerce because they "treat in-state private business interests exactly the same as out-of-state ones." *Ante*, at 13. Again, the critical issue is whether the challenged legislation discriminates against interstate commerce. If it does, then regardless of whether those harmed by it reside entirely outside the State in question, the law is subject to strict scrutiny. Indeed, this Court has long recognized that "'a burden imposed by a State upon interstate commerce is not to be sustained simply because the statute imposing it applies alike to the people of all the States, including the people of the State enacting such statute.'" *Brimmer* v. *Rebman*, 138 U. S. 78, 83 (1891) (quoting *Minnesota* v. *Barber*, 136 U. S. 313, 326 (1890)); accord, *Fort Gratiot Sanitary Landfill, Inc.*, 504 U. S., at 361–363; *Dean Milk*, 340 U. S., at 354, n. 4. It therefore makes no difference that the flow-control laws at issue here apply to in-state and out-of-state businesses alike.[4] See *Carbone, supra*, at 391 ("The [flow-control] ordinance is no less discriminatory because in-state or in-town proc-

_____

[4] A law granting monopoly rights to a single, local business clearly would not be immune from a dormant Commerce Clause challenge simply because it excluded both in-state and out-of-state competitors from the local market. See *C & A Carbone, Inc.* v. *Clarkstown,* 511 U. S. 383, 391 (1994). It is therefore strange for the Court to attach any significance to the fact that the flow-control laws at issue here apply to in-state and out-of-state competitors alike.

ALITO, J., dissenting

essors are also covered by the prohibition").

\*     \*     \*

The dormant Commerce Clause has long been understood to prohibit the kind of discriminatory legislation upheld by the Court in this case. I would therefore reverse the decision of the Court of Appeals.